Grand jury trans. p.10 ln.18-p.11 ln.4 "Powers told Agent
Guerard(UC) to drive up to the street and pullover, which he
did. The CS, the confidential source(CI), and Powers got out
of undercover vehicle, walked up to the corner and just around
the corner on Dix and Denny, and they were met there by Butter.
At this time Butter was given $3,000 government funds, he handed
the, I believe it was a paper bag that contained a plastc bag,
that contained what was allegedly to be crack cocaine, to the
confidential source again walked down to the undercover vehicle,
got in with special agent Guerard and left the area."

     No where in this account does agent Anderson say"the CI
said or from the CI's debriefing." These are spoken in agent
Anderson's own words. Somewhat different from Grand Jury I
where he speaks in the voice of the CI ie."from the debriefing"
Again how could the grand jurors know when agent Anderson is
speaking from his own account of the facts or from the CI's
debriefings. Here in Grand Jury II some 20 months after alleged
conspiracy, 17 months after intial grand jury proceeding, count-
less statements from CI and Powers (cooperating witness),
debriefing of agents and overview of their reports, prosecutor
should have known the agent's grand jury testimony of "sham
sale" was inconsistant with what he actually saw during his
surveillance.

     Sometime late in the pre-trial process it became clear
that this case was going to trial. This being the case, pro-
secution begins to fight issues inthe form of motion. One such
motion caused the CI to write an affidavit in which he now claims
"he never made a hand to hand transaction with Butter on Nov.16,
1998 at the "sham sale." This is absolutely contrary to every-

-thing the prosecution has said prior about the"sham sale."
Agent Anderson now seems to have testified falsely at two grand
juries and supported a lie conjured up by the CI.  This is not
the case.  He still has not revealed that he knows 1st hand
from his own eyes that what the CI told him that night, 9 days
later at 1st debriefing and other debriefings was not true.
The prosecutor after realizing the CI has changed his story
should have known that agent Anderson either knew the CI wasn't
being truthful about "sham sale" and was supporting the lie;
or agent Anderson didn't see anything on Nov. 16, 1998 the "sham
sale."  In either instance agent Anderson is wrongfully
falsifying evidence to the grand jury.

    Just hours before the trial it is established that CI lied
about his actions during the "sham sale."  What has not been
established is agent Anderson's involvement.  On day two of
the trial trans. p.2-56 prosecution begins questioning agent
Anderson about "sham sale."  Trial trans. p.2-57 ln.13 "Q.
What did you (agent Anderson) do when he (CI) went into 6 Denny
St.  A. I set up surveillance."  Trial trans. p.2-58 ln.2 "
Q. What did you do, sir? A. At the time I was doing surveillance
and monitoring the kel. Q. were you in visual contact with them
on this date? A. Yes Q. What did you see happen?  A. I saw them
walk up to the corner of Dix St. and then got on--- you could
see it was really Mozynski, and I couldn't see Powers.  Q. So
Mozynski was standing alone at one point?  A. Yes  Q. And you
could not see Powers?  A.  Correct.  Q.  What's the next thing
you saw?  A. I saw Mozynski walking back to the UC vehicle.
Q. Now, Did you see Powers at some point after you saw Mozynski
alone?

A. I don't believe so.  I didn't.  Q. So you saw Mozynski alone
at some point, and you saw him get into the undercover vehicle
alone?  A. Yes.

This is the 1st time at any court proceeding under oath
that agent Anderson admits that while doing surveillance,
watching CI and Powers, he never saw any hand to hand transaction
between CI and Butter,  A complete turn around from the previous
testimony given at Grand Jury I and II.  The agent reveals this
only because the CI, in the last minute, changed his story.
Agent Anderson intentionally gave the grand jury false statements
and concealed tis information.  He did so to make the grand
jury believe that Butter and CI made a hand to hand crack sale
for $3,000 that turned out to be a sham perpetrated by Butter.

After agent Anderson's trial testimony the prosecutor knows
without a doubt that agent previously testified falsely about
"sham sale."  The prosecutor and agent are now leading the petit
jury into thinking agent Anderson always knew that CI never
left corner, never made hand to hand transaction.  Completely
contrary to what grand jurors were led to believe.  The
prosecution, although not soliciting false evidence allows it
to go uncorrected when it appears.  Perkins v. Leferve 642 F.2d
37.

Petitioners trial counsel beganits cross examination at
trial trans. p.2-108 -- 2-112 "... and you never saw Butter
hand crack cocaine to Mozynski and take Mozynski's money, did
you?  A. No, sir."  Trial counsel's line of questioning leads
to trial trans. p.2-111 ln. 20 ..."Q. So when he was telling
you he did a hand to hand transaction that didn't even square
with what you saw with your own eyes did it?  A. No."  This

statement affirm s fact that agent Anderson intentionally test-
ified falsely to the grand juries.  Petitioner's trial counsel
elicits damaging testimony from the agent but does not probe
further to let petit jury know the agent testified to the
contrary under oath.  Had the jurors known it may have cast
a cloud of doubt on the prosecution's only credible witness.
Why was he lying to the grand jury and is he lying to us, the
petit jury?

        In U.S v. Wallach 935 F.2d 445; "Indeed if government
knowingly permitted introduction of false testimony reversal
is virtually automatic."  There, defendants sought a new trial
because a key government witness committed perjury at trial.
Witness was arrested and charged with perjury.  The dist. court,
however, denied the motion for new trial, finding that the
perjury would have been, "cumulative additions to the massive
mound of discredit heaped upon witness over several days of
both direct and cross examination."  Applying the standard
announced in Agurs and reaffirmed in Bagley, ie. "Where the
prosecution knew or should have known of the perjury, the con-
viction must be set aside, if there is reasonable likelihood
that the false testimony could have affected the judgment of
the jury."

        This case differs from Bagley.  Here the witness' perjured
testimony goes back to the grand jury as well as at the trial.
There was nothing to discredit the agent's testimony.  He was
seen as an experienced DEA agent and the governments most cred-
ible witness.  In Wallach the 2nd circuit disagreed with the
dist. court.  Stating, "Had it been brought to the attention

22

of the jury that the witness was lying.  His entire testimony
may have been rejected by the jury.  It was one thing for the
jury to learn witness had a history of improprieties; it would
have been an entirely different matter for them to learn that
after having taken an oath to speak the Truth, He made a con-
scious decision to lie... Accordingly we are convinced that
the government should have known that the witness was committing
perjury and all the convictions must be reversed."  The same
is true in the present case.  Had the petit jury known agent
Anderson had lied in previous hearings about anything under
oath especially material facts of the case, they may have rejec-
ted his entire testimony.

During the sentencing phase Petitioner's trial counsel
in a motion for downward departure, makes a claim of government
misconduct on the part of agent Anderson sent. trans.p.19.
t

The prosection's response is very telling. sent. trans. p.23-
26.  "The recod does not support agent Anderson's actions as
being misconduct and the jury by its verdict, flatly rejected
it."  Thecourt asks the prosection to address Petitioner's trial
counsel's  allegations against agent Anderson.  The prosection's
response.  "There are fundamental differences, your honor,
between people making mistakes and people lying and trying to
mislead either this court or the grand jury.  What happened
in this case... And with respect to Mozynski walking up that
street and whether it was a hand to hand between him and Powers
or Powers and Henderson or Henderson and Moazynski... Again,
he freely acknowledged that fact.  He didn't testify falsely

23

to your Honor. He stood up to the plate and said, with respect to that, he's right. That was an error. And that's all it is, your Honor. It was an unfortunate mistake. Mistakes happen. There is no basis for suggesting it has anything to do either with the conviction or of the sentencing of this defendant."

The prosecution now has the opportunity to correct agent Anderson's false testimony, they do not. Instead they claim it was a mistake and Anderson owned up to it in front of the jury and the court. This is the prosecution trying to clean up the agent's perjury, making light of the scope and importance of this, so called, mistake. That is misconduct. The Supreme Court held in Williams v. U.S 504 U.S 36,52; The government's creation or acceptance of an erroneous impression that related to such evidence, could support a defendants argument that mistake was intentional misconduct.

The court itself in denying Petitioner's motion for downward departure noted and agreed with an erroneous statement agent Anderson made. Showing that prosection and the agent's actions were misleading at best. The Court said, sent. trans. p.26 ln.11-17 "I deny the motions for downward departure and in denying them, find that as far as this court can discern ther was no government misconduct, that is, no misconduct on the part of Special Agent Anderson, notwithstanding the fact that the cooperating witness did things that were unathorized and that would have warranted a deactivation had they been known before the fact..."

The end of that declaration stems from a false statement the agent made at trial. The Petitioner's trial counsel

continues to cross examine agent at trial trans. p.2-113 ln.38
"Q. If you found out in 1998 or 1999 that he lied to you about
hand to hand sale on Nov. 16, 1998, where he says he met Butter
but didn't would you have deactivated him then? A. It was
after everybody was arrested; and we were in the prosecutorial
part of the stage. So it's unlikely that I'd deactivate him
at that point." This is a false statement before the petit
jury and the trial court. It goes to cover why agent did not
deactivate the CI. The problem with this is agent Anderson
knew CI was lying about hand to hand from the beginning. He
was there and saw the events unfold with his own eyes, not months
later in the prosecutorial stage when CI decides to change his
story. In U.S v. Johnson 767 F.2d 1259,1275, the court defines
perjury as intentional, voluntary, and knowing false statement.
This is a false statement yet the petit jury does not know it
is a false statement because Petitioner's trial counsel does
not pursue it in his cross examination. Thus, trial counsel
was ineffective (see Point I issue III).

    At Grand Jury, the prosection leads jurors to believe all
the CI's evidence, provided via hearsay by agent Anderson, is
truthful and trustworhty. This is done knowing CI has lied
to them about material facts of alleged conspiracy. Grand Jury
I trans. p.20 ln.1-6; "Did you find the CI to be truthful and
accurate when you compared his debriefings to the tapes of the
transactions? A. Yes He's been very truthful and forthcoming
about what's been going on and how they contact him and how
often they contact him." This is very self serving and nothing

could be further from the truth.  From the beginning of the
alleged conspiracy CI lied and misinformed the agents about
his actions.  At one point CI and Powers were actually living
and getting high together off the governments funds without
agents ever knowing.  The CI told agents what he wanted them
to know and when he wanted them to know it from the beginning.
At Grand Jury I p.20 ln.13-15, a grand juror, curious about
the physical evidence taken in the form of tape recordings asks,
"Q.  Okay. But overall the tape recordings were pretty clear,
except on maybe on occasion? A.  Yes. Yes"  This is an unfair
accessment. the tape recordings were so bad (inaudible) that
in pre-trial there was continuous debate on whether to or how
to use tape recordings at all.

      Thes statements to the grand jurors were to make it seem
as if everything went smoothly and there was no doubt that
indictment on all five counts was warranted.  In Alcorta v.
State of Texas 355 U.S 28, The Supreme Court said, "Outright
falsity in a particular answer need not be shown if the testimony
taken as a whole, intentionally gave the jury a false impress-
ion.

      At all stages of this proceeding, pre-trial, trial, and
at sentencing the prosecution had opportunity to correct the
false testimony when it appeared.  Instead the prosecution relied
upon false testimony throughout the proceedings, particularly
at the grand jury.  In U.S v. Basurto 497 F.2d 781 the court
said, "Whenever the prosecutor learns of any perjury committed
before the grand jury he is under duty to immediately inform
the court and opposing counsel. If perjury may be material

and also the grand jury- in order that the appropriate action may be taken.[11]  The prosecution did not live up to its duty in this case.  In Mesarosh v. U.S 352 U.S 1 (1956), The Supreme Court  gave an example of a prsecutor living up to duty. ie. ...While review of petitioner's convictions was pending... the solicitor general informed the court, of indications he had just received, that government's witness testimony at trial had testified falsely in other proceedings.  While government believed testimony truthful at trial, it suggested remand to district court for determination of credibility  of witness. The Supreme Court reverse and granted new trial.

In the present case Petitioner prays the honorable court will readjust its view of the prosecutorial misconduct and vacate this conviction and remand for new trial.  This circuit's court said in U.S v. Osorio 929 F.2d 753,763; "Courts should be willing to consider invoking their supervisory powers to secure enforc- ment of better prosecutorial practice and reprimand of those who fail to observe it."

<u>Point III</u>

Warrantless search violation of Fourth Amendment:

At the pre-trial stage Petitioner filed an affidavit in support of trial counsel's motion to suppress Fruits of warrantless search (dock# 99-1). Agent Anderson filed an Affidavit in support of prosection's response to defense motion to suppress (dock# 106). The court haerd witness testimony, accepted exhibit and heard oral argument on the issue.

Just moments prior to the actual motion hearing on March 20, 2001, the prosection informs the trial counsel that there has been a "so called," mistake. There was a change in the original story told by agent Anderson's Affidavit. The court remarks tha this issue, "...involved a truth contest..." motion hearing trans. p.13 ln.17-18. The Petitioner's side says wallet was seized illegaly from the vehicle violating his 4th amend. rights. The prosection side says wallet was obtained and evidence seized lawfully as to incident to arrest.

Petitioner submits his side of the story is correct and should be heard. Agent Anderson's affidavit was faulty, though in the last minute the prosecution corrected it before this court. Whether intentionally or mistakenly affidavit was undenibly incorrect on at least one material fact. The case UC agent Guerard could not remember the particulars of the arrest motion hearing trans. p.43 ln.6-18. Lastly, and most telling, the agent Anderson's perjured testimony at two grand juries and at the trial throws his credibility into question. Being the trial court had to decide the issue, an evidentary hearing is warranted.

Petitioner was arrested by DEA agents on March 15, 1999, at a probation office in the baesment of the Worcester Court House on Harvard St.  During the service of the arrest warrant the keys to Petitioner's vehicle were seized.  UC agent Guerard took the keys out to the street, searsh for and found the vehicle on a side street away from the courthouse.  The agent had no reason or motive to look for and go to vehicle.  The UC agent Guerad claims, "...I was going to drive it back to the Marshal's to secure it here...I wanted to find the car because I wanted it...I wanted to get it secure at the Marshal's so that if Mr. Henderson were released later on that day or a member of his family or wife or girlfriend wanted to retrieve the vehicle, it would have been safe and secure, not on that hill."  This is his alleged motive prior to even knowing where the vehicle is located.  Prosection AUSA Sinnot says, "Well, securing, impounding, by any other name, it's the same thing,..."  This is an highly unlikely story.  Agent Guerard is not a local police officer with "Community Caretaking Responsibilities."  In Cady v. Dembrowski 413 U.S 433 (1973), The court desribed "the community caretaking functions" routinely undertaken by local police officers: Local police officers, **unlike federal officers**, frequently investigate vehicle accidents in which there is no claim of criminal liabilty and engage in what, for want aof a better term may be described as community caretaking functions, totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute.

Noninvestigatory search of automobiles pursuant to this

function, according to the court do not offend 4th amend.

principles so long as such activites are warranted, in terms

of state law or sound police procedure, "and are justified by

concern for the safety of the general public who might be en-

dangered if an intruder removed" a weapon which police reasonably

believed was present and located in a part of the vehicle vul-

nerable to vandals..." A wallet is a far cry from a weapon and

poses no safety risk.  Also the vehicle was legally parked on

a side street of the courthouse not in danger of being vandalized

There was no reason to seize, secure, impound or search the

car.

    Petitioner was in the custody of the arresting agents and

by agent Geurard's own account, "He (Petitioner) complied with

Special Agent Anderson's request, Whatever that may have been.

He was vey cooperative." motion hearing trans. p.36 ln.5-6.

Petitioner posed no threat and was unable to reach the car to

manipulate, remove, or destroy anything in it including any

evidence.  In U.S v. Francolino 367 F.2d 1013,1017 Judge

Friendly stated, "We see no reason in principle why a car parked

immediately outside a house should stand better than a room

inside it which was not the place where defendeant was arrested.

Drummond v. U.S 350 F.2d 983,987.  Castaldi v. U.S 384 U.S 944

(1966).  The question rather is whether there was fair basis

for belief that the place searched--whether inside the house

or immediately outside it--would contain instruments or fruits

of the crime for which the arredst was made.  Harris v. U.S

supra, 331 U.S at 152-153.

    In U.S v. Preston supra 376 U.S at 367, The court declared:

The rule allowing contemporaneous searches is justified, for

example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the desruction of evidence of the crime.  Things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control.  But these justifications are absent where a search is remote in time or place from the arrest  and in custody, then a search made at another place, without a warrant, is simply not an incident to the arrest...  Where Petitioner was under arrest at courthouse seizure of wallet from vehicle outside and streets away is not incident to arrest.

According to U.S v. Kelly 547 F.2d 82; The Constitution forbids only unreasonable searches and seizures, Elkins v. U.S 364 U.S 206,222 (1960).  It seems abundantly clear that there is a significant constitutionsl difference between stopping, seizing and searching a car on the open highway, and entering private property to seize and search an unoccupied parked vehicle not then being used for an illegal purpose.  Here the vehicle was locked and parked legally on the street.

The UC agent Guerard went out of courthouse in search of vehicle.  Once he found vehicle he used key to enter and then seized the wallet therin.  He returned to the courthouse and gave wallet to agent Anderson.  Anderson proceeded to search through wallet seize and copy all of wallets content.Heclaims to have recorded all the information on a form, motion hearing trans. p.23-24. This form was never produced to the defense in violation of the Brady rule of discovery.

In U.S v. Lugo 978F.2d 631, "...search of a truck and the resulting seizure of the firearm, cocaine was valid search

incident to his arrest.  Such a search is controlled by New

York v. Belton 453 U.S 454, ...It follows, therefore, that a

warrantless search incident to arrest is not valid if it is

"remote in time or place from the arrest," Chimel v. Cali.

395 U.S at 764 ... such that "no exigency exits." U.S v.

Chadwick 433 U.S 1,15; Thus, the rationale for a search incident

to arrest had evaporated.  Sabourin's inventory was not

contemporaneous because it was remote in time and in place as

regards Lugo and his truck being in entirely different locations

and no exigency existed.  As the court in Chadwick explained:

Once law enforcement officers have reduced...personal property

not immediately associated with the person of the arrestee to

their exclusive control, and there is no danger that the

arrestee might gain access to the property to seize a weapon

or destroy evidence a search of that property is no longer an

incident of the arrest.

Petitioner maintains that search of car and subsequent

seizure of wallet was unlawful.  Still, if the court finds the

search of car and seizure of wallet lawful, further search of

and seizure of walets content by agent was not.  In US v. Doe

61 F.3d 107, "Warrantless search at the police station-after

any exigency had ceased violated the 4th amendment...After

initial lawful search to find a container their must be probable

cause or warrant to open or go into container."  Agents had

no probable cause to look into wallets contents. 61F.3d at 111

Although probable cause, as well as exigent circumstances, may

support the warrantless seizure of an enclosed opaque container,

see Texas v. Brown 460 U.S 730,743 (1983) (involving validity

of warrantless seizure of tied off balloon containing drugs),

the same probable cause showing is not necessarily sufficient

32

to justify its subsequent warrantless search. Id at 749-51...
Normally, therefore, once exigency ends, as by an arrest or
the seizure and custodial retention of a container by the police,
a neutral judicial officer must authorize any subsequent search
on a showing of probable cause.  U.S v. Soule, 908
F.2d 1032,1040."

According to the agents' testimony Petitioner's wallet
was seized at his arrest, motion hearing trans. p.23 ln.1-14;
"...We told him to empty his pockets. He took everything out
of his pockets and placed them on the table.  I took the wallet."
If the court finds this to be fact, which Petitioner denies,
it still does not give the agent the right to search and seize
and or copy contents of the wallet.  In U.S v Berenguer 562
F.2d 206 (1977) the appeallate was shackled to Sansone on a
bed and the billfold was clearly out of his reach or immediate
control.  See Chimel v. California, 365 U.S 752,763.  The content
of the wallet was not in plain view for agent to seize.  The
Plain view doctrine for warrantless searches and seizures is
subject to three express requirements (1)agents must be lawfully
on the premises; (2)the discovery must be inadvertent, and (3)its
incriminating nature must be immediately apparent.  Coolidge
v. New Hampshire, 403 U.S 443-69.  The agent may past muster
of the first requisite but fails on the other two.  Agent Anderson
prposely went through wallet looking for evidence; motion hearing
trans p. 27 ln. 11- p.28 ln.21. The last requirement was not
met at intial review of documents in wallet. In Berenguer the
the court having determined that money was illegally s·

33

seized it follows that it was error to permit the government
agent to testify about finding it. We must therefore determine
whether the error was prejudicial or harmless beyond reasonable
doubt.  Chapman v. California 386 U.S 18 (1967).  The contents
of the wallet were used at all stages of the trial for
prosecution to develope its circumstantial evidence against
petitioner.  The effect of the fruits of the warrantless search
on the trial was highly prejudicial and without such evidence
Petitioner would not have been convicted.

34

Point IV

Pawn shop receipt

Petitioner's trial counsel objected to the admission of the pawnshop receipt foer a watch. The government argues that the receipt shows Petitioner had $320 to retieve a watch as a direct result of getting $3,000 in alleged drug transaction. Trial trans. p.5-102-5-105.

All the pertainent case law says showing of substantial sums of money from unexplained sources is relevant and admissible "Possession of large amounts of unexplained cash in connection with the evidence of narcotics trafficking is generally relavant and admissible." U.S v. Ariza-Ibarra 605 F.2d 1216,1225 "Evidence of large sums of unexplained cash is relevant to demon- strating an individual's involvement in illegal drug activities" U.S v. Figueroa 976 F.2d 1446,1454.

In the present case the amount of money spoke of is $320 for a pawned watch. If document is understood to mean what prosecution says it means. In any event $320 is a far cry from a showing of substantial or large sums of money. The prosecution is reaching, this in no way, shape, or form shows the petitioner' status or financial condition. In Williams v. U.S 168 U.S 382 (1897), the defendant was accused of taking two bribes of $85 and $100 from Chinese immigrants- a financial event of such small scale as not to suggest any connection with the bank deposits of the defendant and his wife of less than $5,000.

As in this case the payment of a pawned watch is of such a small scale as not to suggest the money had to have come from the alleged drug transaction. No connection in the evidence

35

is made to corroborate the prosecution's conjecture.    The
admission of the pawnshop receipt was more prejudicial than
probative and should never have been admitted into evidence
for the jury to weigh.

#### Conclusion

Based on the foregoing, Petitioner prays and requests the
Honorable Court to vacate the judgement of conviction in this
cause and order that he be afforded a new trial.

Respectfully submitted,

Chamond Henderson 08/09/04

Chamond Henderson

#80165-038

Fort Dix West

P.O Box 7000-5802

Fort Dix, New Jersey

08640

Certificate of Service

I, Chamond Henderson, certify that, on July 22, 2004,
I caused three copies of the foregoing brief to be served by
mail on the clerk of the district court.


United States District Court
Office of the Clerk
595 Main Street, Room 502
Worcester, Ma 01608


Respectfully submitted,
Chamond Henderson
prose Petitioner

37

## Certificate of Service

I, Chamond Henderson, certify that, on July 22, 2004, Icaused one copy of the foregoing brief to be served by mail on the AUSA John A. Wortman, Jr.

John A. Wortman Jr.

Assistant United States Attorney

One Courthouse Way

Boston, Ma 02210

(617) 748-3207

Respectfully submitted,
Chamond Henderson
Pro se Petitioner

*Chamond Henderson*

30