UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHAMOND HENDERSON            )
                             )
                             )
         v.                  )    Civil No. 04-40119-NMG
                             )
                             )
UNITED STATES OF AMERICA     )

### GOVERNMENT'S OPPOSITION TO 2255 PETITION
### AND REQUEST FOR DISMISSAL

On April 30, 2001, a jury convicted Chamond Henderson of various drug-related crimes after a six-day trial.[1] Notwithstanding vigorous representation by an experienced and able defense lawyer,[2] the jury convicted Henderson of the crimes with which he was charged and found that he was responsible for more than 50 grams of cocaine base, a/k/a "crack cocaine" on three separate counts.

The verdicts in this case reflected the enormity of the government's evidence. That evidence evolved around four

---

[1] Henderson was convicted of conspiracy to distribute more than 50 grams of crack cocaine and four counts of distribution of crack cocaine. See Verdict (Docket 172). The jury found that two of the distribution counts (the deals dated October 27, 1998 and November 3, 1998 involved at least 50 grams of crack cocaine and that two (the deals dated October 19, 1998 and November 17, 1998) involved 5 or more grams of crack cocaine. Id. Given Henderson's criminal record, any one of the convictions on Counts 1, 3, and 4 would have required the Court to impose the 240 month sentence that it did. See 21 U.S.C. §841(b)(1)(A).

[2] Henderson was represented by three experienced defense counsel over the course of this case. Initially, he was represented by Peter Ettenberg, a well-known and seasoned defense counsel in the Worcester area. By order dated December 18, 2000, Mr. Ettenberg was allowed to withdraw after it appeared that he had a conflict of interest due to his prior representation of a government witness. Peter Parker (a former federal defender with substantial experience in federal drug cases) thereafter filed an appearance and represented Henderson through the trial and sentencing. On appeal, Henderson was represented was John Ouderkrk.

controlled purchases of a total of more than 198 grams of crack cocaine, a video of Henderson arriving at the residence of one of his co-defendants to do one of the deals, photographs of a CW and a co-defendant going into Henderson's residence to buy drugs on another date, the testimony of two cooperating witnesses who made crack cocaine purchases directly from Henderson, the testimony of an undercover agent who dealt with one of Henderson's co-defendants and made consensually recorded telephone calls to Henderson via a pager subscribed to in Henderson's name, and reams of other evidence (including three eyewitness identifications) connecting Henderson to the crimes.

Prior to being charged in this case, Henderson had amassed two prior drug trafficking convictions. As a result of the efforts of his trial counsel (the same counsel who Henderson has now so soundly criticized), one of those convictions was vacated. The effect of these efforts was to free Henderson from a mandatary life sentence. See 21 U.S.C. §841(b)(1)(A).

Henderson was sentenced on September 19, 2001. After a contested hearing in which defense counsel challenged the constitutionality of 21 U.S.C. §851(c) and asserted various grounds for departure based on, among other things, the very issues alleged here, this Court sentenced Henderson to 240 months in prison. This represented the absolute minimum sentence that Henderson could have gotten based on the findings the jury made

and his undisputed criminal history.

Henderson thereafter appealed both his conviction and his sentence on a variety of grounds advanced by another experienced defense lawyer. On February 14, 2003, the United States Court of Appeals affirmed Henderson's conviction and sentence, rejecting every one of the seven grounds of alleged error. <u>United States v. Henderson</u>, 320 F.3d 92 (1st Cir. 2003).[3]

Notwithstanding all of the foregoing, Henderson thereafter filed the present Petition ("the Petition") under 28 U.S.C. § 2255.[4] Initially, Henderson filed *no* facts in support of the Petition, content to simply allege three conclusory grounds for relief and demand that his conviction and sentence be set aside.[5] After the government moved to dismiss based on the absence of any supporting facts, Henderson filed a 37-page document entitled "Supporting Facts, Memorandum of Law Points, Issues and

---

[3] The grounds of error asserted by Henderson's appellate counsel included the denial of Henderson's pretrial motion to suppress certain identification evidence by two of the cooperating witnesses, the admission of the pawn shop receipt found in Henderson's wallet (an issue that was contested at trial, raised and rejected on appeal, and that Henderson is nevertheless seeking to raise again here), the constitutionality of 21 U.S.C. §851(c), aspects of the prosecution's closing argument, three aspects of this Court's jury instructions, the application of <u>Apprendi v. New Jersey</u> to Henderson's prior drug trafficking convictions, and the admission of co-conspirator statements under FRE 801(d)(2)(E). Each and every argument was rejected by the First Circuit. See <u>United States v. Henderson</u>, 320 F.3d 92 (1st Cir. 2003).

[4] A copy of the Petition on which page numbers have been added is attached as Exhibit 1.

[5] These grounds were ineffective assistance of counsel at "pretrial, trial and appellate stages," prosecutorial misconduct based on use of perjured testimony, and supposedly invalid search conducted incident to arrest.

Authorities in Support of Motion to Vacate Sentence Pursuant to 28 U.S.C. §2255." Although this document rambles, and is completely unverified, it appears to set forth a number of distinct claims. The government will therefore respond to the basic arguments it believes are set forth in the Petition and will demonstrate that Henderson has utterly failed to set forth a cognizable section 2255 claim.

As best the government can figure out based on its review of the Petition,[6] Henderson has set forth the following grounds for relief:

(1) That Attorney Parker failed to provide constitutionally adequate representation by not calling witnesses at the March 20, 2001 hearing on the defendant's Motion to Suppress;

(2) That Attorney Parker failed to provide constitutionally adequate representation by not moving to dismiss the indictment and/or moving for a required finding of not guilty based on the government's alleged use of perjured testimony;

(3) That Attorney Parker failed to provide constitutionally adequate representation by not putting on a defense case involving the defendant's allegedly successful music promotion business; and,

(4) That Henderson's constitutional rights were violated by the admission at trial of a pawn shop receipt found in his wallet.

After reviewing the evidence introduced at trial and other relevant facts, the government will demonstrate that none of these arguments raise any factual issues or provide any basis for

---

[6] To the extent that there any additional claims that the Court believes has been adequately set forth in the Petition, the government will be pleased to address them in a subsequent pleading.

4

relief. Accordingly, the Petition must be summarily dismissed.

## STATEMENT OF THE CASE

The government's case against Chamond Henderson was instituted on February 17, 1999, when a federal grand jury returned an indictment against Henderson and two co-defendants, Robert Carey, a/k/a "Pops", and Kimberly Powers. A superseding indictment against Henderson, Carey, and Powers was returned on July 13, 2000 which added drug weight and other allegations.

Count One of the superseding indictment charged that from October 19, 1998 to November 17, 1998, Henderson conspired with others to possess with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. § 846. Counts Two through Five charged Henderson and others with possessing, and aiding and abetting the possession of, cocaine base with the intent to distribute it, and with distribution of cocaine base on October 19, 1998 (more than 5 grams), October 27, 1998 (more than 50 grams), November 3, 1998 (more than 50 grams), and November 17, 1998 (more than 5 grams), all in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

There was substantial activity in the case prior to trial. As set forth above, defense counsel was successful in vacating one of Henderson's prior drug trafficking convictions, thereby freeing him from the potential of a mandatory life sentence. In addition, Henderson obtained funds for a private investigator,

5

moved to suppress certain evidence (including the contents of the wallet seized at arrest and the anticipated identification testimony by the cooperating witnesses), and filed dozens of motions in limine and subpoenas seeking to restrict the government's evidence or to obtain impeachment information regarding expected government cooperating witnesses. A hearing was held on the suppression motions on March 20, 2001 and those motions were denied. See Docket (March 21 and 28, 2001 Orders).

After still more filings were made by defense counsel, the case proceeded to trial on April 23, 2001. Seven days later, on April 30, 2001, the jury convicted Henderson on all counts and found that there was more than 50 grams of crack cocaine involved in the conspiracy and in two of the four distribution counts.[7] On September 19, 2001, the district court sentenced Henderson to 240 months in prison.[8]

---

[7] After her indictment, Powers pled guilty to one count of conspiracy to distribute crack cocaine and four counts of possession with intent to distribute crack cocaine. [D.42]. Powers testified at trial pursuant to a plea agreement with the United States. [4 TR 143-45, 202-03].

The jury convicted co-defendant Carey of conspiring to distribute cocaine base and aiding and abetting the distribution of cocaine base.

[8] The court imposed sentence only after a lengthy sentencing hearing in which numerous arguments (including the very government misconduct alleged here) were pressed and only after Henderson launched into a lengthy allocution attacking the government's prosecution but never suggesting a whit of dissatisfaction with his counsel or the tactical decisions made during the course of the prosecution. After listening to Henderson for a substantial period, the Court interrupted him and imposed sentence after noting the following:

> That was an incredible performance, Mr. Henderson but not once did I hear anything about why I shouldn't sentence you in accordance with the rules and

## THE EVIDENCE AGAINST HENDERSON AT TRIAL[9]

In considering the claims raised in the Petition, there is no more important task than reviewing the strength of the government's trial evidence and the breadth of the evidence against Henderson. As is indicated more fully below, that evidence demonstrates that, even if Henderson could show that the aggressive representation he received from all of his counsel somehow fell below the level of competence required by the Sixth Amendment (and it did not), Henderson cannot show prejudice and the Petition must be denied.

In October 1998, the Drug Enforcement Administration ("DEA") began an investigation into crack cocaine trafficking in Worcester, Massachusetts. [3 TR 150-53]. The DEA used Joseph

---

regulations and guidelines because you really aren't a drug dealer or you really aren't guilty of the crimes with which you are convicted.

. . . . . . . . . . . . . . . .

You are perhaps the most articulate defendant that's ever appeared before me in my nine years on the bench. If you had turned that intelligence to something that was law-abiding, you could have made something of yourself that you and the rest of the community and your friends would be proud. Instead, you turned to pushing drugs on this community and not a small amount of drugs, Mr. Henderson – I beg to differ –a large amount of drugs as far as I'm concerned, over a substantial period of time. And for that conduct and for the crimes for which you have been convicted, you will go to jail ...and you will deserve it.

Sentencing Tr (September 19, 2001) at 17-18.

[9] Facts set forth in this section come from the trial transcripts. Citations to trial transcripts are to the day and page of the trial; "[2 TR 45]," for example, refers to page 45 of the second day of trial.

Mozynski, a known crack cocaine user, to serve as a cooperating witness in its investigation. [3 TR 80-81]. Mozynski made four purchases of cocaine base from Henderson and co-defendant (and later cooperating witness) Kimberly Powers during the course of the investigation. [5 TR 65]. Two of these drug transactions took place in the basement of 27 Wachusett Street in Worcester, the building in which Henderson lived. [5 TR 10, 18, 69-70; 5 TR 88; 4 TR 197-99; Ex. 42]. The other two transactions occurred within a two-block radius of Wachusett Street. [5 TR 88-90]. All of the transactions were surveilled and both the deals as well as conversations leading up to them were consensually recorded by the CW and a UC who met with Henderson's co-defendant and spoke with Henderson about crack cocaine sales on at least one occasion that was recorded. [3 TR 95-101].

    A.   **The October 19, 1998, Sale of Crack Cocaine**

On October 19, 1998, Mozynski purchased 23.7 grams of cocaine base from Henderson. [3 TR 100-103]. The transaction took place at 6 Denny Street in Worcester, where Carey and Powers were living at the time. [4 TR 168]. Prior to October 19, Mozynski spoke with Carey, who indicated he would get the cocaine from an individual known as "Butter" but who was identified as Henderson. [3 TR 91-94]. Mozynski and Carey arranged that Mozynski would pay $1,200 for 25 grams of cocaine, with Carey getting $200 of the $1,200 for facilitating the deal, and that

Mozynski would pick up the crack cocaine at 6 Denny Street. [3 TR 95, 97].

On October 19, Mozynski met with DEA Special Agents Timothy Anderson and Robert Guerard, who searched Mozynski, outfitted him with a recording device, and watched him as he went into 6 Denny Street (Carey's home). [1 TR 155-59; 3 TR 94-95].[10] Mozynski entered 6 Denny Street and met with Powers, Carey, and a woman named Lynn Cappalett. [3 TR 97]. Mozynski showed Powers the $1,200 in buy money, and Powers told Carey to page Henderson on his pager. [3 TR 98-99]. Powers subsequently spoke by phone with Henderson, advised him that Mozynski was there with the money, and then informed Mozynski that Henderson would be there within 5 minutes. [3 TR 98-99].

Agent Anderson observed and videotaped Henderson, wearing a black and gold football jersey, walk down Denny Street and enter the driveway of 6 Denny Street. [1 TR 159]. Henderson, Mozynski, and Powers went into a bedroom where Mozynski gave Henderson $1,200 and Henderson gave Mozynski a package containing crack cocaine. [3 TR 100-03; 4 TR 173]. Mozynski and Henderson discussed doing larger deals in the future and Henderson told Mozynski to contact him only through Powers. [3 TR 103]. Mozynski and Powers each testified at trial that it was Henderson

---

[10] Mozynski wore a recording device during the subject drug transactions and portions of the recordings were played for the jury. The sound quality of the recordings was poor, however, and the recordings therefore had only limited utility during trial.

who brought the drugs.

Three to four minutes after Henderson arrived, Agent Anderson observed and videotaped Mozynski leaving 6 Denny Street; Mozynski went immediately to the DEA agents, who took custody of the package of crack. [3 TR 103-04; 5 TR 97-98; 1 TR 170]. One or two minutes later, Agent Anderson observed and videotaped Henderson leave 6 Denny Street. [1 TR 160, 170]. Analysis subsequently determined that the package Mozynski received from Henderson contained 23.7 grams of cocaine base. [Ex. 34].

### B.   **The October 27, 1998, Sale of Crack Cocaine**

On October 27, 1998, Mozynski met Powers at 6 Denny Street in order to purchase three ounces of crack from Henderson. [3 TR 115-17; 4 TR 175-77]. Mozynski and Powers left 6 Denny Street and met Agent Guerard in his undercover car; Agent Guerard introduced himself to Powers as Mozynski's customer and gave Powers $3,000 to buy crack from Henderson. [4 TR 177; 5 TR 98-99]. Powers directed Agent Guerard to drive to a nearby location where Powers and Mozynski got out of the car. [4 TR 177-78; 5 TR 99]. Agent Guerard watched Mozynski and Powers walk toward 27 Wachusett Street (where trial evidence showed that Henderson lived). [5 TR 99-100]. Mozynski and Powers met with Henderson in the basement of Henderson's apartment building at 27 Wachusett Street, where Mozynski gave Henderson the $3,000 and Henderson gave Mozynski a piece of newspaper with a plastic bag containing

crack cocaine. [3 TR 115-17; 4 TR 178-79]. Immediately upon leaving 27 Wachusett Street, Mozynski met with Agent Guerard, who searched Mozynski and took custody of the plastic bag, the contents of which were subsequently analyzed and determined to contain 73.2 grams of crack cocaine. [3 TR 117; 5 TR 100; Ex. 34].

    C.    **The November 3, 1998, Sale of Crack Cocaine**

Prior to November 3, 1998, Mozynski contacted Powers about making another purchase of crack cocaine. [3 TR 127]. Powers suggested Mozynski talk to Henderson directly; Mozynski paged Henderson and Henderson returned the page. [3 TR 128]. Mozynski spoke with Henderson by phone and they agreed to do another drug deal at Henderson's apartment building in the same fashion as the October 27 deal. [3 TR 128].

On November 3, 1998, Mozynski met with Powers at 6 Denny Street to purchase three ounces of crack cocaine from Henderson. [1 TR 126-30; 4 TR 183-84; 5 TR 100]. Mozynski and Powers then met with Agent Guerard, who gave Powers the money and drove them to a location near 27 Wachusett Street. [4 TR 184-85; 5 TR 100]. Powers and Mozynski again met with Henderson in the basement of 27 Wachusett Street. [3 TR 133; 4 TR 187]. Mozynski gave Henderson $3,000 and Henderson gave Mozynski a package containing crack cocaine. [3 TR 133-34; 4 TR 187]. After leaving 27 Wachusett Street, Mozynski met with Agent Guerard and gave him

the package of crack cocaine he had received from Henderson. [4 TR 134; 5 TR 103]. A DEA agent took still photographs of Powers and Mozynski walking into Henderson's apartment building to get the crack. [4 TR 186]. Analysis later determined that the package contained 81.09 grams of cocaine base. [Ex. 34].

### D. The November 16 Sale of Sham Wax and the November 17, 1998, Sale of Replacement Crack Cocaine

On November 16, 1998, Mozynski met with Guerard and Powers to purchase three more ounces of crack. [4 TR 189; 5 TR 107]. Mozynski first met Powers and Carey at 6 Denny Street, and then Powers and Mozynski left the house and met with Agent Guerard, who provided them with $3,000 to buy crack. [4 TR 190]. Powers directed Guerard to drive to another location, where Powers and Mozynski got out of the car, and Powers met with Henderson on the street while Mozynski waited a short distance away. [4 TR 190-91; 1 TR 148-50]. Powers gave Henderson the $3,000 and Henderson gave her a piece of newspaper containing a substance in a plastic bag. [4 TR 191]. Powers then gave the package to Mozynski. [4 TR 191]. The substance in the plastic bag was later determined to be wax. [5 TR 91].

Mozynski met with Carey at 6 Denny Street later that evening at Guerard's direction after the sale of the sham wax had been detected. [3 TR 154]. Carey acknowledged that Henderson was the source of the wax and was the supplier of the crack previously purchased. From Carey's apartment, Mozynski then spoke by

12

telephone with Henderson, who said that he would provide Mozynski with the cocaine he admitted he owed him. [3 TR 167]. Mozynski left 6 Denny Street, met with Agent Guerard, and provided Agent Guerard with Henderson's pager number, 978-734-6195, which Guerard dialed. [5 TR 91-92; 3 TR 158-59]. Henderson returned the call and Agent Guerard spoke by telephone with Henderson, who promised one ounce of crack on the following day (November 17) and two-and-one-half ounces on the day after that (November 18). [5 TR 93-95]. The beeper number that Mozynski provided to Agent Guerard, and that Agent Guerard used to contact "Butter," 978-734-6195, was subscribed to by "D. Henderson" of "27 Wahusset Street, Worcester, MA." [3 TR 65-66; 5 TR 92]. Henderson, whose middle name is David, lived at 27 Wachusett Street in Worcester. [See Exs. 42, 47, 50; 5 TR 10, 18, 69-70].

On November 17, 1998, Mozynski arranged with Henderson, through Powers, to obtain one ounce of crack cocaine promised by Henderson to Agent Guerard in the recorded conversation. [3 TR 160-61; 4 TR 194-96]. Mozynski met Powers on Goulding Street in Worcester -- which is within two blocks of 27 Wachusett Street -- where Powers handed Mozynski a package that contained the ounce of crack cocaine supplied by Henderson. [3 TR 161; 4 TR 195-96; 5 TR 108]. Immediately thereafter, Mozynski met Agent Guerard and gave him the package of crack cocaine. [5 TR 108-09; 3 TR 162] Analysis subsequently determined that the package contained

13

19.68 grams of cocaine base. [Ex. 34].

### E. Other Evidence of Crack Cocaine Distribution By Henderson And Carey

Powers testified at trial that she bought crack cocaine from Henderson on a daily basis throughout the period of the conspiracy and sometimes made purchases from him several times a day, usually purchasing an ounce of crack at a time, which she then distributed to her retail customers. [4 TR 154-56, 158-59, 196]. Powers also testified that Carey regularly dealt with Henderson during this same period. [4 TR 163-64]. Powers testified that Carey regularly purchased additional amounts of crack from Henderson, which Carey either used himself or resold to his own customers. [4 TR 164].

**ARGUMENT**

### A. The Court Should Deny Henderson's Petition Without Conducting An Evidentiary Hearing.

In seeking collateral relief from his jury convictions in this case, Henderson bears the burden of demonstrating, by a preponderance of evidence, not only that he is entitled to relief under § 2255, but also that there are factual disputes that entitle him to an evidentiary hearing. Barrett v. United States, 965 F.2d 1184, 1186 (1st Cir. 1992); United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993); Cody v. United States, 2001 WL 487947 at *5 (1st Cir. 2001). An evidentiary hearing is

14

unnecessary when a § 2255 petition "is inadequate on its face" or, "although facially adequate[,] is conclusively refuted as to the alleged facts by the files and records of the case." McGill, 11 F.3d at 226. *See also* Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993)(accord); Barrett, 965 F.2d at 1186 (accord). A petitioner is not entitled to an evidentiary hearing where his allegations "cannot be accepted as true because 'they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact,'" Murchu v. United States, 926 F.2d 50, 57 (1st Cir. 1991)(citation omitted); McGill, 11 F.3d at 226 (accord), or where they "amount to mere 'bald' assertions without sufficiently particular and supportive allegations of fact," Barrett, 965 F.2d at 1186. As the First Circuit has explained:

> A district court may dismiss a section 2255 petition without holding an evidentiary hearing if it plainly appears on the face of the pleadings that the petitioner is not entitled to the requested relief, or if the allegations, although adequate on their face, consist of no more than conclusory prognostications and perfervid rhetoric, or if the key factual averments on which the petition depends are either inherently improbable or contradicted by established facts of record.

United States v. LaBonte, 70 F.3d 1396, 1412-13 (1st Cir. 1995). The trial judge, moreover, "is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." McGill, 11

F.3d at 225. See also <u>Cohen v. United States</u>, 996 F. Supp. 110, 112 (D. Mass. 1998)(Young, CJ)(a court "may rely on its own recollections of previous events when deciding a motion brought under section 2255"). Accord, <u>Norton v. United States</u>, 1997 WL 305222 at *2 (D. Mass. 1997)(Young, CJ); <u>Indelicato v. United States</u>, 106 F. Supp. 2d 151, 154 (D. Mass. 2000)(Saris, J).

Henderson claims that his counsel--all his counsel-- were constitutionally ineffective in their handling of his matter from beginning to end.[11] In fact, the record in this case-which establishes that Henderson received aggressive representation at all stages of the proceeding-was to the contrary. More importantly, even assuming that some aspect of Henderson's legal advice was deficient, Henderson cannot establish actual prejudice since the things that he now claims his lawyers should have done were ill advised, would never had been successful, and would not have effected the overwhelming weight of the evidence against him. Accordingly, this Court must dismiss Henderson's action without conducting an evidentiary hearing. See <u>Dias v. Moloney</u>, 156 F. Supp 2d. 104 (D.Mass. 2001)(Young, C.J.)( declining to hold evidentiary hearing based on allegations of ineffective assistance of counsel associated with alleged failure to call

---

[11] Henderson alleges that he was denied effective representation throughout the proceeding. He has also claimed that he was denied effective representations in other matters as well. See Affidavit of Chamond Henderson (July 25, 2001) (claiming that Henderson's South Carolina attorney was also derelict in literally every aspect of his representation as well.

witnesses where Petitioner failed to allege facts which, if proved, would entitle him to relief).

B. **Henderson Has Failed To Meet His Burden Of Establishing A Constitutionally Deficient Performance By His Attorney And Actual Prejudice Flowing From His Attorney's Performance.**

   1. **Legal Standards**

      **(a) Habeas Review Under 28 U.S.C. § 2255**

Section 2255, Title 28, United States Code, provides a means for collateral attack on the sentence under which a federal prisoner is confined. United States v. Haymen, 342 U.S. 205 (1952). The law is "well-settled" that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). "A presumption of finality attaches to criminal convictions once all direct appeals have been exhausted." Singleton v. United States, 26 F.3d 233, 236 (1st Cir. 1994). See also Barefoot v. Estelle, 463 U.S. 880, 887 (1983). "[T]o obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." Id. at 167-68.

In order for relief to lie under §2255, the claimed error must be jurisdictional, constitutional, "a fundamental defect which inherently results in a complete miscarriage of justice",

17

or "an omission inconsistent with the rudimentary demands of fair procedure." United States v. Addonozio, 442 U.S. 178, 185 (1979); Hill v. United States, 368 U.S. 424, 428 (1962). Simply put, "post conviction relief on collateral review is an extraordinary remedy, available only on a sufficient showing of fundamental unfairness." Singleton, 26 F.3d at 236; See also Brecht v. Abrahamson, 507 U.S. 619, 634-634 (1993).

### (b) Ineffective Assistance of Counsel Claims

Under the well-known test enunciated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), in order to prevail, Henderson must establish (1) that "counsel's performance was deficient ... that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "that the deficient performance prejudiced the defense ... that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. See also Bucuvalas v. United States, 98 F.3d 652, 658 (1st Cir. 1996)(observing that a defendant's burden of proving both prongs of the Strickland test is "heavy").

Under the first prong, Henderson must demonstrate that his

attorneys' representation "fell below an objective standard of reasonableness." Id. at 687-88. See also Murchu, 926 F.2d at 58 (accord). Because there is a wide range of professionally competent representation and there are an infinite number of situations in which counsel must make strategy decisions (thereby tempting disappointed defendants to second-guess counsel's assistance after an adverse result, judicial scrutiny of trial counsel's performance "must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689. See also Matthews v. Rakiey, 54 F.3d 908, 916 (1st Cir. 1995)(accord); Ouber v. Guarino, 158 F. Supp. 2d 135, 148 (D. Mass. 2001) (observing that habeas court "owes a high degree of deference to the judgment exercised and decisions made by counsel" and that habeas review "is not an occasion for judicial second-guessing of informed judgments").

In applying the Strickland standard, the First Circuit has emphasized that "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." United States v. Natanel, 938 F.2d 302, 309-10 (1st Cir. 1991); Lema,

987 F.2d at 51 (accord); <u>Arizaga v. United States</u>, 130 F. Supp. 2d 335, 338 (D. P.R. 2001)(accord).

> Under *Strickland v. Washington*, ... counsel is not incompetent merely because he may not be perfect. In real life, there is room not only for differences in judgment but even for mistakes, which are almost inevitable in a trial setting, so long as their quality or quantity do not mark out counsel as incompetent.

<u>Arroyo v. United States</u>, 195 F.3d 54, 55 (1st Cir. 1999). *See also* <u>McGill</u>, 11 F.3d at 227 ("To avoid the shoals of ineffective assistance, an attorney's judgment need not necessarily be right, so long as it is reasonable."); <u>Tavares v. United States</u>, 2001 WL 1681861 at *4 (D. Mass. 2001) (Bowler, MJ)(observing that the Sixth Amendment "guarantees proficient as opposed to perfect representation")(*citing* <u>Prou</u>, 199 F.3d 37, 48 (1st Cir. 1999)).

Like the Supreme Court, the First Circuit has also emphasized that the performance standard "is to be applied not in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented." <u>Natanel</u>, 938 F.2d at 309. *See also* <u>Lema</u>, 987 F.2d at 51 (observing that habeas court must evaluate the challenged conduct "from counsel's perspective at the time" and must make every effort "to eliminate the distorting effects of hindsight"); <u>Matthews</u>, 54 F.3d at 917 (that counsel's trial strategy "was not ultimately a winning strategy is of no moment in assessing its reasonableness at the time"); <u>Ouber</u>, 158 F. Supp. 2d at 148