US District Court
District of Massachusetts
Worcester Division


Chamond Henderson

petitioner

v.

United States of America

repondant

Civil action
No. 04-40119


Suppoting facts, Memorandum of law points, Issues and
Authorities in support of Motion to Vacate Sentence pursuant
to 28 U.S.C 2255.


Comes now, Petitoner, Chamond Henderson, and respectfully moves
this Honorable Court to vacate, set aside, or correct the
sentence imposed herein, as grounds and reaso therefore,
respectfully states;


Statement of Jurisdiction

The Jurisdiction of this court is invoked pursuant to
Title 28, United States Code, Section 2255.

## Statement of the Case

On FEb. 17, 1999, a grand jury returned indictments against the Petitioner along with two co-defendants. The parties then embarked on a lengthy journey through the discovery process. On July 13, 2000, the grand jury returned superceding indictments upon which Petitioner was tried. Those indictments alleged that the Petitioner conspired to possess cocaine base with the intent to distribute, and conspired to actually distribute cocaine base (count one), possessed with intent to distribute and did actually distribute cocaine base within 1,000ft. of a school on or about Oct. 19, 1998 (count two), and on or about Oct. 27, 1998 (count three) and on or about Nov. 3, 1998 (count four), and did aid and abet in the possession with the intent and actual distribution of cocaine base on or about Nov. 17, 1998 (count five).

One of the co-defendants, Kim Powers (hereinafter "Powers"), reached an accord with the government, and pled guilty with an agreement to testify against the other two. trial trans. p. 4-202. Discovery continued, however, on Nov. 21, 2000, new counsel was appointed for the Petitioner. Throughout March and April of 2001, the final flurry of pre-trial motions were heard and decided, and the government filed an information to enhance the Petitioner's sentence.

On April 23, 2001 the trial began. trial trans. p.1-1. It continued for six days, concluding with the jury's guilty verdict on April 30, 2001 trial trans. p. 6,1;128. Five witnesses testified, and forty-nine exhibits were entered into evidence. The Petitioner was sentenced on Sept. 19, 2001, and was committed to the custody of the Bureau of Prisons for 240

2

months.

The Petitioner filed a notice of appeal on Sept. 21, 2001. Thereafter, on Sept. 25, 2001, the government moved to dismiss the preceding indictments, which was allowed. The record was transmitted to the US Court of Appeals on Oct. 10, 2001. Direct appeal was filed March 22, 2002. Government's response was filed June 5, 2002. Reply brief filed June 20, 2002. US Court of Appeals for the 1st Circuit affirmed conviction on Feb. 14, 2003. On May 8, 2003 petition for cert. in the US Supreme Court. Petition for cert. was denied on June 16, 2003.

This is Petitioner's 1st 2255 motion. Petitioner has filed no other post-conviction motions in this court nor any other court pertaining to this matter. Petitioner does have a petition in the South Carolina Supreme Court attacking the prior 1991 conviction in which the 21 U.S.C 851 enhancement is predicated.

Petitioner is currently incarcerated at FCI Fort Dix, New Jersey 08640, Petitioner has been in continuous custody since his arrest herein, on or about March 15, 1999.

## Argument

### Point I :

_____Petitioner was denied effective assistance of counsel at pre-trial, trial, and at appeal stages in violation of Petitioner's Sixth Amendment right to effective assistance of counsel.

In Gideon v. Wainwright, 372 U.S. 335 (1963), the Supreme Court held that the sixth amendment right to counsel was essential to a fair trial so as to due process of law. It has long been recognized that the right to assistance of counsel is the right to effective assistance of counsel. Cuyler v. Sullivan 446 U.S. 335-344 (1980); Powell v. Alabama 287 U.S. 45 (1932).

Hence, the right to effective assistance of counsel is dependent on the right of counsel itself. See Wainwright v. Torma, 455 U.S. 580, 587-88 (1982); and it is axiamatic that appointed counsel falls within the ambit of the sixth amendment guarantee of effectvie assistance of counsel.

Also the right of counsel attaches "at or after the initation of adversary judicial proceedings against the defendant." U.S. v. Gouveia 467 U.S. 180 (1984).
In Evits v. Lucy 469 U.S. 387 (1985), the Supreme Court held that effective assistance of counsel on first appeal was a right guaranteed by the due process clause and the sixth amendment.

In the case at bar, Petitioner was denied effective assistance of counsel at rhe pre-trial, trial, and on appeal. Petitioner was represented by three different counselors. At the early pre-trial (Peter Ettenburg), at pre-trial and trial (Peter Parker), and on appeal (John T. Ouderkirk Jr.).

4

In presenting this ineffective claim Petitioner is familiar with the U.S. Supreme Court's Strickland test that was enunciated in the case of Strickland v. Washington 466 U.S 688(1984). The prejudice rule that was articulated in Strickland and in subsequent cases, generally require the accused to show a reasonable probability that counsel's supposed error affected the result of the criminal proceeding in question.  Strickland requires the accused to demonstrate that counsel's prformance was in fact deficient, and that counsel's errors prejudiced the defendant to the extent of being denied a fair trial.

Moreover, the Strickland court stated that the standard for evaluating counsel's performance is that of reasonably effective assistance according to the prevailing norms.  Id at 688.  That counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceedings. Id at 687-88.

The Strickland court has held that there must be a showing that but for counsel's alleged error, there was a reasonable probability that the results would have been different.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  U.S. v. Bagley, 473 U.S. 667 (1985).

Moreover, trial counsel did not present any defense that would have shown the government had failed to prove the existence of any agreement, expressed or implied, in which Petitioner had willfully, knowingly, and intentionally entered to become a member of any conspiracy.  Nor did trial counsel present any defense that would have shown that the government had failed

5

...-ally possessed with intent to distribute cocaine.

For trial counsel had a defense prepared and then did not use it. He only gave a boilerplate defense to Petitioner. Trial counsel made only one motion for judgment of acquital (Rule 29) for Petitioner. The trial court denied that motion. Aside from counsel's ineffectiveness, the outcome of Petitioner's trial would have been different. Had counsel been effective at Petitioner's trial, Petitioner would not have been convicted of all five counts of the offense herein. Nor would Petitioner been sentenced to 240 months in prison, that is 20 years under the prevailing Federal law, Petitioner is ineligible for parole, and must serve 85% of the 240 months.

Issue I:

During the pre-trial stage of this case counsel was ill prepared to argue motion to suppress fruits of warrantless search (dock# 99). Counsel neglects to interview or subpoena key eye witness in dispute of where wallet was seized from during Petitioner's arrest. Maureen Chamberlain and one of her co-workers were in the probation office prior to and during the arrest. P.O. Chamberlain and co-worker exited the office at some point after the initial arrest warrant was served.

P.O. Chamberlain and her co-worker work for the state and had no stake in the matter either way. Their eye witness account would have been paramount in the pursuit of the truth of the matter. Counsel did not interview or subpoena any of the people that were involved in the arrest to prepare for the motion hearing. In Hanes v. Dormire 240 F.3d 694, counsel failed to dispose or interview or subpoena any of states witnesses.

6

Here counsel had opportunity to get a third party's input to decide matter that was by the courts own words,"a truth contest..." motion hearing trans. p.6 ln.17-18.

Counsel was also not prepared to effectively argue the points of law. The court posed legal questions counsel could not answer, requiring an extention of six days to respond. Motion hearing trans. p. 49,55. Stating to the court, "You know, I don't have anything ready to hand to the court right now. I would like the opportunity to look carefully for that." Trial counsel should have been prepared to answer the courts on the matter knowing this motion hearing was pending an evidentary hearing. Trial counsel was appointed by the court to represent Petitioner. Trial counsel's performance was deficient; and Petitioner was prejudiced thereby.

"The 6th amend. requires not merely the provision of counsel to the accused in a criminal prosecution, but assistance which is to be for his defense, and thus, the core purpose of the counsel quaranty is to assure assistance at trial when accused is confronted with both the intricacies of the law and the advocacy of the prosecution; if no actual assistance for the accused's defense is provided, then the constituional quaranty has been violated" U.S Cronic, 466 U.S 648,655 (1984); U.S v. Ash, 413 U.S 300, 309 (1973)  "the constitution's qurantee of effective assistance of counsel cannot be satisfied by mere formal appointment." Avery v. Alabama, 308 U.S 444,446 (1940).

<u>Issue II:</u>

    During trial stage counsel's opening statement about Petitioner's music promotions business trial trans. p. 138 ln.5-12 which would have shed light on Petitioner's finances, was never supported by testimonial evidence.  This testimony would have come from the 10+ witnesses that counsel decided not to call. In turn prosecution used that to say in closing argument Petitioner was "indeed a successful businessman, that is a succ-essful businessman in the business of crack cocaine." trial trans. p.6 line 23.  This testimony would have also refutted prosecution's theory of Petitioner using drug transaction money to retrieve pawned items namely $320 for a watch.

    Counsel attempted to paint a picture of defense at onset of trial.  Then abandoned that picture by not presenting a defense.  Ouber v. Guarino 293 F3d. 19, 35-36, failing to fullfill a promise made in an opening statement, to call a witness or to present evidence has amounted to ineffective assistance of counsel.

## Issue III:

After coming to the realization at trial that there was a problem of perjured testimony in the grand jury, counsel should have filed a motion to dismiss indictment.  During agent Anderson's trial testimony ,trial trans.p.2-57  it became apparent that he knew from the time the so called, "Sham sale" took place that CI Mozynski never made a hand to hand, face to face deal wiht "Butter" or anyone other than Powers.

At that point there should have been vigorous cross examination of agent Anderson to establish why he had gone before two previous grand juries and lied about what he saw with his own eyes.  Instead of drawing out the reasoning why behind this falsification, trial counsel makes one mention of it then backs away from the issue.  This was an opportunity for the petit jury to learn that agent Anderson, the governments most credible witness, had testified under oath before two grand juries and in light most favorable to the agent supported lies about material facts.  Instead there was no credibility attack or impeachment by defense of agent Anderson.

Lastly, at trials conclusion counsel does not attack the indictment for use of perjured testimony.  Nor makes mention of it in his Motion for acquital Rule 29 arguments.  Defendants may dismiss indictments to remedy government misconduct, including vindictive prosecution, prosecutorial misconduct in grand jury proceedings... Bank of Novia Scotia v. U.S. 487 U.S 250,254 What sound defense strategy is not to attack or expose but to ignore a defect or violation once you know it exists.  "The noun "strategy" is not an accused lawyers talisman that

9

necessarily defeats a charge of constitutional ineffectiveness...
The strategy, which means "a plan, method, or series of maneuvers
or strategems for obtaining a specific goal or result."  Random
House Dictionary 1298(rev. ed. 1975) must be reasonable.  It
need not be prticularly intelligent or even one most lawyers,
would adopt, but it must be within the range of logical choices
an ordinarily competent attorney... would asses as reasonable
to achieve a "specific goal."

The goal was to protect Petitioner's right to a fundamentally
fair trial.  Allowing prosecution to use perjured testimony
in order to obtain indictment without any attack on it was not
reasonable by any competent attorney's standards.

Issue IV:

    After months of pre-trial investigation and preparation
for defense by previous counsel, in the 11th hour trial counsel
decides not to call any witnesses or present any defense.  Trial
counsel feels the prosecutions case has not been proven beyond
a reasonable doubt.  Before the prosecution rested during a
recess, trial counsel suggests to Petitioner he does not want
to put up defense.  This is the 1st mention of not using all
the 10+ witnesses and following through with the defense planned
on for months in pre-trial.  He says, "the prosecutions case
is weak and he believes his cross examination has been good
enough to establish reasonable with the petit jury."  Petitioner
disputes trial counsel's opinion and arges that prosecutions
story is the only side of the story being heard and there should
be witnesses called and evidence presented on his behalf.
Counsel disagrees and tells Petitioner to sleep on it.

10

Next court date prior to prosection resuming its case in-chief there was a recess.  Counsel again strongly suggests no defense is necessary.  Counsel and Petitioner go back and forth about the defense witnesses and sticking to the planned defense as opposed to relying on the incredible testimony of prosecution witnesses and overall weak case.  Counsel is persuasive.  Prosecution resumes its case shortly thereafter concludes and rests.  Trial counsel notifies the court that defense will rest.  In Harris v. Reed 894 F.2d 871,878; the court has held that Counsel's strategy not to call any witnesses... reliance on percieved weakness of prosecution's case was ineffective."

There was extensive investigation and preparation on facts of case and transactions.  Particularly on the fact that Powers (cooperating government witness) used many other dealers during the time of alleged conspiracy.  Additionally there was evidence that there was another individual with the same street name, "Butter" residing in the same block "Wachusett St." that two of the transactions of this alleged conspiracy took place.  Evidence would have been produced that this other "Butter" has a criminal record of cocaine and crack sale convictions in the immediate area of the transactions of this conspiracy.  Yet trial counsel did not want to provide petit jury with any defense testimony period.  In Strickland 466 U.S. 690 the Supreme Court said "... despite the reasons for not calling these witnesses counsel's change of mind was not even a plausible option." There was no reason for counsel to believe charges would not be proven beyond a reasonable doubt without putting up some defense theory to support his claims from opening argument.

11

Issue V:

On March 20, 2001 a motion hearing took place to resolve many important pre-trial motions. This hearing had witness testimony, exhibits, oral arguments and ex parte motions resolved in front of trial court judge. At the end of the hearing it was clear to Petitioner this hearings transcript would be vital to defense in the future proceedings. Trial counsel orders that only the hearings witness testimony be transcribed by the court reporter. At the appeal stage Petitioner sought to obtain the hearing transcript and was only supplied with an excerpt of the hearing (witness testimony only). Appellate counsel, different from trial counsel, files direct appeal (March 2002) with issues that were dealt with at that March 20, 2001 motion hearing.

The U.S. 1st Circuit Court of Appeals denied Petitioner's direct appeal      . In the court's opinion it states pertaining to the admissibility of the Identification testimony "We were somewhat hampered... We will do the best we can with what we have." U.S. v. Henderson 320F.3d 92,99 ft.nt.#2. It is clear the appellate court deemed it necessary to see the entire record of the proceeding including all evidence admitted, witness testimony, oral arguments, judges comments and overall dialogue pertaining to the motions that were dealt with at the hearing. Appellate counsel did not diligently pursue the full record of the transcript. Though counsel had appeal issues that were fought in pre-trial at this hearing he never made an attempt to review the complete record for error. The Supreme Court stated in Hardy v. U.S. 375 U.S 277(1964) "Indeed the most basic and fundamental tool of an appellate

12

advocate's proffession is the complete transcript... anything short of a complete transcript is incompatible with effective appellate advocacy.  This is even true when trial and appellate counsel are one in the same."  In this case the trial counsel is not the same as the appellate counsel.  According to White v. State of Florida ND. D.C 939 F.2d 912,914 n.4, "...a seperate rule applies when a defendant has a different counsel for direct appeal.  In that event, the absence of a substantial and signifi- cant portion of the record entitles such a defendant to a new trial even absent any showing of prejudice. U.S v. Selva 559 F.2d 1303,1305-1306.

The excerpt of this transcript is only 46 pages out of the complete 98 pages.  The missing portion was not transcribed by district court reporter until April 2004.  The Petitioner finally received the complete transcript after many requests from the court in May 2004 some 23 months after direct appeal was written.  The information in the transcript dealt with not only the issues that were posed on the direct appeal but other issues that the appellate counsel did not have the opportunity to review for error.  This includes fruits of warrantless search, Kel tapes and their transcripts, etc.  In Mayer v. Chicago 404 U.S. 189 the Supreme Court said "due process requires that a defendant be given a reliable record of sufficient completeness to permit proper review of his claims."  This did not happen in this case.

After reading US 1st Circuit Court of Appeals opinion on direct appeal.  Petitioner inquired why appellate counsel did not supply court with the complete record.  He replied, "I did supply the record and besides the court has the full record

13

His reply, though somewhat ridiculous, was truthful.  He believed he supplied the full record when he gave the motion hearing transcript excerpt.  Since trial consel only asked the court to transcibe a portion of the hearing full review was impossible without further pursuit.  Appellate counsel did not diligently pursue the remainder of transcript as did Petitioner to review it for errors.  Especially after Petitioner made mention that complete transcript should be sought for review of possible errors made by court or trial counsel.

Appellate counsel's performance was deficient by the Strickland standard and was so prjudicial that the appellate court made mention of it in their opinion pertaining to the Identification issue.  There were errors made at the hearing pertaining to the fruits of warrantless search (see warrantless search argument in this memorandum) The rest of the issue handled at this hearing were dealing with evidence to submitted at trial. The problem is appellate counsel never reviewed them with trained eyes.  Thus Petitioner was prejudiced because at this point his untrained eye is not skilled enough to pick out errors and then argue them effectively.

Issue VI:

_____Appellate counsel put forth issues that were weak while ignoring the blatent constitutional errors: warrantless search. and perjured testimony in the grand jury proceeding.  In Gray v. Greer 800 F.2d 644. appellate counsel ignored stronger issue and used a weaker one.  Also see Clemmons v. Delo 124 F.3d 944.95 Then appellate counsel goes to change grounds of an already

14

preseved objection (pawnshop receipt). The pawnshop receipt should have been argued at the higher court on relevancy grounds. This would have gotten review at the harmless error standard rather than the more stringent plain error standard.

Petitioner has set forth six issues that the counsel's performance was deficient. Each is a factual account of what and meet both prongs of the Strickland test. In Mach v. U.S 635F.2d 20. 26-27, This circuit's higher court said, "...we accept petitioner's allegations as true except to the extent that they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.

The defective performance of the three different counselors has put the entire proceeding in jepordy. Each of the errors by themselves were prejudicial enough to render the entire proceeding unfair and a violation of Petitioner's due process. As stated in Murray v. Carrier 477 U.S 478, A single isolated error on the part of the counsel can render his assistance ineffective if the error is sufficiently egregious and preju- dicial to the defense.

Petitioner was denied effective assistance of counsel at pre-trial, trial, and appellate stage of this process. Thus Petitioner's conviction was obtained in violation of his due process rights and his sixth amendment constitutional right to effective assistance of counsel. This court should vacate Petitioner's coviction.

**Point II:**

Prosecutorial misconduct; knowing use of perjured testimony in Grand Jury proceeding.

Long before the nascence of the Brady duty of disclosure, the Supreme Court had declared that the presentation of known false evidence in a criminal trial is incompatible with "Rudimentary demands of justice." Mooney v. Holohan 294 U.S 103,112 (1935); accord, eg., Pyle v. Kanas, 317U.S 213 (1942) Several years before announcing the Brady Rule, the court extends the prohibition of Mooney to the prosecutor's silent acquiescence when false testimony is presented, holding that "the same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. Illinios, 360 U.S 264,269 (1959). Similarly, where a prosecutor manipulates the evidence to create a false impression before the grand jury, this constitutes prosecutorial misconduct and a corruption of the truth seeking function...albeit through somewhat different means. U.S v. Alzate, 47F.3d at 1110.

The controlling rule is that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." U.S v. Agurs 427 U.S 97,103 (1976) (footnote omitted). The prosecutor's knowing failure to disclose that testimony used to convict the defendant was false." stands on the same footing. U.S v. Bagley 473 U.S 667,678 (1985). This relaxed standard of materiality pertains because the presentation of or failure to correct false testimony "involves a corruption

of the truth seeking function of the trial process." Id.at 680 (citation ommitted).  The "reasonable likelihood" standard that applies when false testimony is presented is the functional equivalent of the Chapman v. California, 386 U.S 18 (1967) constitutional harmless-error standard.  U.S v. Bagley, 473 U.S at 679 n.9.  Under that familiar rule, the inquiry is whether there is a "reasonable possibility" that the constitutional error "might have contributed to the conviction," and the burden is on the state "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." U.S v. Bagley, 473 U.S at 679 n.9 (quoting Chapman).

This, 2255, is the 1st time Petitioner is raising the perjured testimony in the Feb. 17, 1999 and July 13, 2000 Grand Juries(from here on known as grand jury I and grand jury II respectively).  Before trial any other objections based on indictment waives such objection.  Courts may however grant a defendant relief upon showing of good cause. US v. Marino 682 F.2d 449,454 n.3.  Petitioner was denied effective assistance of counsel (see Point I isseue III).

The perjured testimony complained of happened at the grand juries, the motion hearing (March 20, 2001), and the trial. All of these false statements were made by angent Anderson the the lead case agent for the DEA in this case and the governments most credible and star witness.  Each false statement pertained to a material fact of the case or an evidence issue.  This In U.S v. Flaherty 668F.2d 566, this circuit's court has said, "Although not a precise rule...perjured testimony must be mat-erial to justify dismissal of indictment on basis of perjured testimony..."  Agent Anderson's testimony fit that requirement.

17

Agent Anderson is the sole grand jury witness.  His test-
imony is the only evidence that the grand jurors had to ascertain
whether or not indictment was warranted in this case.  He
constantly gave hearsay evidence to the grand jury.  In his
capacity, as lead agent, he wasn't involved in any of the trans-
actions, set up of the transactions or particulars of the alleged
conspiracy.  Due to agent Anderson's percieved and literal,
distance from the goings on of the alleged conspiracy, his test-
imony to the grand jury is riddled with, "according to the CI,
from his debriefing, The CI said, etc..."  This is where the
problem lies.  In Estrepa 471 F.2d 1132 the court held that
lack of personal knowledge... nature of presentation to grand
jury.  Required dismissal.  Stressing importance of avoiding
undue reliance on hearsay before grand jury.  The grand jurors
could not have known when agent Anderson was speaking of his
own eye witness account or simply relying what the CI told him
in debriefing.  The prosecutor's line of questioning for the
and Anderson's in and out, up and down responses had to be con-
fusing for the jurors to follow.  This was used to the prosecu-
tions advantage.  The agent had no intention of revealing the
complete truth to the grand jury.  Also U.S v. Estrepa 471 F.2d
1132 at 1136 the court said, "the grand jury must not be misled
into thinking it is getting eye witness testimony from the agent
whereas it is actually being given an account whose hearsay
nature is concealed. U.S v. Leibowitz 420 F.2d 39,42.

The testimony in question pertains to the so called "sham
sale" on Nov. 16, 1998. In Grand Jury I trans. p.14 ln.15,
prosecutor begins asking agent Anderson what occured on Nov.

18

16, 1998, he describes the beginning of "the sham sale." Grand
Jury I trans. P.15 ln.3"The CI and Powers are observed getting
out of the vehicle." It is well documented in the agent Anderson
DEA-6's, debriefing reports, and trial testimony that he was
doing surveillance that night. He is the person who observes
CI and Powers, the other officers mentioned do not arrive until
after "sham sale" has transpired. Grand Jury I trans. p.15
ln.9-13, "from the debriefing, the CI stated that Powers and
the CI met with "Butter." He handed, the CI handed Butter the
$3,000. Butter handed him a newspaper containing a plastic
bag with crack cocaine." Anderson speaks to grand jury as if
he had no knowledge of what transpired during this part of the
"Sham sale" He is only reciting what CI told him at debreifing.
Prosecutor and agent Anderson are falsely leading grand jury
to believe agent Anderson had no personal knowledge of what
took place at "sham sale." At this point prosecutor should
have known what the agent actually and knew from his own personal
eye witness surveillance of the "sham sale." and whether or
not it was consistant with agent's police reports and the CI's
statements. The introduction of perjured testimony constitutes
a fundamental defect. According to U.S v. Biberfeld 957 F.2d
98,102, "If a prosecutor uses testimony it knows or should know
is perjury, it is fundamentally unfair to an accused.

In Grand Jury II trans. p.9 ln.24 prosecutor begins saking
agent Anderson what happened on Nov. 16, 1998 "the sham sale".
Agent Anderson again describes the beginning of the "sham sale"
p.10 ln.10 "he (CI) was observed going---walking into 6 Denny
Street" Again agent Anderson is doing the surveillance himself

19

when he says, "observed" he is the one that sess what happened.

Grand jury trans. p.10 ln.18-p.11 ln.4 "Powers told Agent Guerard(UC) to drive up to the street and pullover, which he did. The CS, the confidential source(CI), and Powers got out of undercover vehicle, walked up to the corner and just around the corner on Dix and Denny, and they were met there by Butter. At this time Butter was given $3,000 government funds, he handed the, I believe it was a paper bag that contained a plastc bag, that contained what was allegedly to be crack cocaine, to the confidential source again walked down to the undercover vehicle, got in with special agent Guerard and left the area."

No where in this account does agent Anderson say"the CI said or from the CI's debriefing." These are spoken in agent Anderson's own words.  Somewhat different from Grand Jury I where he speaks in the voice of the CI ie."from the debriefing" Again how could the grand jurors know when agent Anderson is speaking from his own account of the facts or from the CI's debriefings.  Here in Grand Jury II some 20 months after alleged conspiracy, 17 months after intial grand jury proceeding, count- less statements from CI and Powers (cooperating witness), debriefing of agents and overview of their reports, prosecutor should have known the agent's grand jury testimony of "sham sale" was inconsistant with what he actually saw during his surveillance.

Sometime late in the pre-trial process it became clear that this case was going to trial.  This being the case, pro- secution begins to fight issues inthe form of motion.  One such motion caused the CI to write an affidavit in which he now claims "he never made a hand to hand transaction with Butter on Nov.16, 1998 at the "sham sale." This is absolutely contrary to every

20

-thing the prosecution has said prior about the"sham sale."
Agent Anderson now seems to have testified falsely at two grand
juries and supported a lie conjured up by the CI. This is not
the case. He still has not revealed that he knows 1st hand
from his own eyes that what the CI told him that night, 9 days
later at 1st debriefing and other debriefings was not true.
The prosecutor after realizing the CI has changed his story
should have known that agent Anderson either knew the CI wasn't
being truthful about "sham sale" and was supporting the lie;
or agent Anderson didn't see anything on Nov. 16, 1998 the "sham
sale." In either instance agent Anderson is wrongfully
falsifying evidence to the grand jury.

Just hours before the trial it is established that CI lied
about his actions during the "sham sale." What has not been
established is agent Anderson's involvement. On day two of
the trial trans. p.2-56 prosecution begins questioning agent
Anderson about "sham sale." Trial trans. p.2-57 ln.13 "Q.
What did you (agent Anderson) do when he (CI) went into 6 Denny
St. A. I set up surveillance." Trial trans. p.2-58 ln.2 "
Q. What did you do, sir? A. At the time I was doing surveillance
and monitoring the kel. Q. were you in visual contact with them
on this date? A. Yes Q. What did you see happen? A. I saw them
walk up to the corner of Dix St. and then got on--- you could
see it was really Mozynski, and I couldn't see Powers. Q. So
Mozynski was standing alone at one point? A. Yes Q. And you
could not see Powers? A. Correct. Q. What's the next thing
you saw? A. I saw Mozynski walking back to the UC vehicle.
Q. Now, Did you see Powers at some point after you saw Mozynski
alone?

21

A. I don't believe so.  I didn't.  Q. So you saw Mozynski alone
at some point, and you saw him get into the undercover vehicle
alone?  A. Yes.

This is the 1st time at any court proceeding under oath
that agent Anderson admits that while doing surveillance,
watching CI and Powers, he never saw any hand to hand transaction
between CI and Butter.  A complete turn around from the previous
testimony given at Grand Jury I and II.  The agent reveals this
only because the CI, in the last minute, changed his story.
Agent Anderson intentionally gave the grand jury false statements
and concealed tis information.  He did so to make the grand
jury believe that Butter and CI made a hand to hand crack sale
for $3,000 that turned out to be a sham perpetrated by Butter.

After agent Anderson's trial testimony the prosecutor knows
without a doubt that agent previously testified falsely about
"sham sale."  The prosecutor and agent are now leading the petit
jury into thinking agent Anderson always knew that CI never
left corner, never made hand to hand transaction.  Completely
contrary to what grand jurors were led to believe.  The
prosecution, although not soliciting false evidence allows it
to go uncorrected when it appears.  Perkins v. Leferve 642 F.2d
37.

Petitioners trial counsel beganits cross examination at
trial trans. p.2-108 -- 2-112 "... and you never saw Butter
hand crack cocaine to Mozynski and take Mozynski's money, did
you?  A. No, sir."  Trial counsel's line of questioning leads
to trial trans. p.2-111 ln. 20 ..."Q. So when he was telling
you he did a hand to hand transaction that didn't even square
with what you saw with your own eyes did it?  A. No."  This

22

statement affirms fact that agent Anderson intentionally test-
ified falsely to the grand juries.  Petitioner's trial counsel
elicits damaging testimony from the agent but does not probe
further to let petit jury know the agent testified to the
contrary under oath.  Had the jurors known it may have cast
a cloud of doubt on the prosecution's only credible witness.
Why was he lying to the grand jury and is he lying to us, the
petit jury?

In U.S v. Wallach 935 F.2d 445; "Indeed if government
knowingly permitted introduction of false testimony reversal
is virtually automatic."  There, defendants sought a new trial
because a key government witness committed perjury at trial.
Witness was arrested and charged with perjury.  The dist. court,
however, denied the motion for new trial, finding that the
perjury would have been, "cumulative additions to the massive
mound of discredit heaped upon witness over several days of
both direct and cross examination."  Applying the standard
announced in Agurs and reaffirmed in Bagley, ie. "Where the
prosecution knew or should have known of the perjury, the con-
viction must be set aside, if there is reasonable likelihood
that the false testimony could have affected the judgment of
the jury."

This case differs from Bagley.  Here the witness' perjured
testimony goes back to the grand jury as well as at the trial.
There was nothing to discredit the agent's testimony.  He was
seen as an experienced DEA agent and the governments most cred-
ible witness.  In Wallach the 2nd circuit disagreed with the
dist. court.  Stating, "Had it been brought to the attention

23

of the jury that the witness was lying.  His entire testimony may have been rejected by the jury.  It was one thing for the jury to learn witness had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the Truth, He made a conscious decision to lie... Accordingly we are convinced that the government should have known that the witness was committing perjury and all the convictions must be reversed."  The same is true in the present case..  Had the petit jury known agent Anderson had lied in previous hearings about anything under oath especially material facts of the case, they may have rejected his entire testimony.

During the sentencing phase Petitioner's trial counsel in a motion for downward departure, makes a claim of government misconduct on the part of agent Anderson sent. trans.p.19.
t

The prosection's response is very telling. sent. trans. p.23-26.  "The recod does not support agent Anderson's actions as being misconduct and the jury by its verdict, flatly rejected it."  Thecourt asks the prosection to address Petitioner's trial counsel's allegations against agent Anderson.  The prosection's response.  "There are fundamental differences, your honor, between people making mistakes and people lying and trying to mislead either this court or the grand jury.  What happened in this case... And with respect to Mozynski walking up that street and whether it was a hand to hand between him and Powers or Powers and Henderson or Henderson and Moazynski... Again, he freely acknowledged that fact.  He didn't testify falsely

24

to your Honor. He stood up to the plate and said, with respect
to that, he's right. That was an error. And that's all it
is, your Honor. It was an unfortunate mistake. Mistakes happen.
There is no basis for suggesting it has anything to do either
with the conviction or of the sentencing of this defendant."

The prosecution now has the opportunity to correct agent
Anderson's false testimony, they do not. Instead they claim
it was a mistake and Anderson owned up to it in front of the
jury and the court. This is the prosecution trying to clean
up the agent's perjury, making light of the scope and importance
of this, so called, mistake. That is misconduct. The Supreme
Court held in Williams v. U.S 504 U.S 36,52; The government's
creation or acceptance of an erroneous impression that related
to such evidence, could support a defendants argument that
mistake was intentional misconduct.

The court itself in denying Petitioner's motion for downward
departure noted and agreed with an erroneous statement agent
Anderson made. Showing that prosection and the agent's actions
were misleading at best. The Court said, sent. trans. p.26
ln.11-17 "I deny the motions for downward departure and in
denying them, find that as far as this court can discern ther
was no government misconduct, that is, no misconduct on the
part of Special Agent Anderson, notwithstanding the fact that
the cooperating witness did things that were unathorized and
that would have warranted a deactivation had they been known
before the fact..."

The end of that declaration stems from a false statement
the agent made at trial. The Petitioner's trial counsel

25

continues to cross examine agent at trial trans. p.2-113 ln.38

"Q.  If you found out in 1998 or 1999 that he lied to you about hand to hand sale on Nov. 16, 1998, where he says he met Butter but didn't would you have deactivated him then?  A.  It was after everybody was arrested; and we were in the prosecutorial part of the stage.  So it's unlikely that I'd deactivate him at that point."  This is a false statement before the petit jury and the trial court.  It goes to cover why agent did not deactivate the CI.  The problem with this is agent Anderson knew CI was lying about hand to hand from the beginning.  He was there and saw the events unfold with his own eyes, not months later in the prosecutorial stage when CI decides to change his story.  In U.S v. Johnson 767 F.2d 1259,1275, the court defines perjury as intentional, voluntary, and knowing false statement. This is a false statement yet thepetit jury does not know it is a false statement because Petitioner's trial counsel does not pursue it in his cross examination.  Thus, trial counsel was ineffective (see Point I issue III).

At Grand Jury, the prosection leads jurors to believe all the CI's evidence, provided via hearsay by agent Anderson, is truthful and trustworhty.  This is done knowing CI has lied to them about material facts of alleged conspiracy.  Grand Jury I trans. p.20 ln.1-6;  "Did you find the CI to be truthful and accurate when you compared his debriefings to the tapes of the transactions?  A. Yes He's been very truthful and forthcoming about what's been going on and how they contact him and how often they contact him."  This is very self serving and nothing

26

could be further from the truth.  From the beginning of the
alleged conspiracy CI lied and misinformed the agents about
his actions.  At one point CI and Powers were actually living
and getting high together off the governments funds without
agents ever knowing.  The CI told agents what he wanted them
to know and when he wanted them to know it from the beginning.
At Grand Jury I p.20 ln.13-15, a grand juror, curious about
the physical evidence taken in the form of tape recordings asks,
"Q.  Okay. But overall the tape recordings were pretty clear,
except on maybe on occasion? A.  Yes. Yes"  This is an unfair
accessment. the tape recordings were so bad (inaudible) that
in pre-trial there was continuous debate on whether to or how
to use tape recordings at all.

    Thes statements to the grand jurors were to make it seem
as if everything went smoothly and there was no doubt that
indictment on all five counts was warranted.  In Alcorta v.
State of Texas 355 U.S 28, The Supreme Court said, "Outright
falsity in a particular answer need not be shown if the testimony
taken as a whole, intentionally gave the jury a false impress-
ion.

    At all stages of this proceeding, pre-trial, trial, and
at sentencing the prosecution had opportunity to correct the
false testimony when it appeared.  Instead the prosecution relied
upon false testimony throughout the proceedings, particularly
at the grand jury.  In U.S v. Basurto 497 F.2d 781 the court
said, "Whenever the prosecutor learns of any perjury committed
before the grand jury he is under duty to immediately inform
the court and opposing counsel.  If perjury may be material

and also the grand jury- in order that the appropriate action may be taken." The prosecution did not live up to its duty in this case. In Mesarosh v. U.S 352 U.S 1 (1956), The Supreme Court gave an example of a prsecutor living up to duty. ie. ...While review of petitioner's convictions was pending... the solicitor general informed the court, of indications he had just received, that government's witness testimony at trial had testified falsely in other proceedings.  While government believed testimony truthful at trial, it suggested remand to district court for determination of credibility  of witness. The Supreme Court reverse and granted new trial.

In the present case Petitioner prays the honorable court will readjust its view of the prosecutorial misconduct and vacate this conviction and remand for new trial.  This circuit's court said in U.S v. Osorio 929 F.2d 753,763; "Courts should be willing to consider invoking their supervisory powers to secure enforc- ment of better prosecutorial practice and reprimand of those who fail to observe it."

28

## Point III

Warrantless search violation of Fourth Amendment:

At the pre-trial stage Petitioner filed an affidavit in support of trial counsel's motion to suppress Fruits of warrantless search (dock# 99-1). Agent Anderson filed an Affidavit in support of prosection's response to defense motion to suppress (dock# 106). The court haerd witness testimony, accepted exhibit and heard oral argument on the issue.

Just moments prior to the actual motion hearing on March 20, 2001, the prosection informs the trial counsel that there has been a "so called," mistake. There was a change in the original story told by agent Anderson's Affidavit. The court remarks tha this issue, "...involved a truth contest..." motion hearing trans. p.13 ln.17-18. The Petitioner's side says wallet was seized illegally from the vehicle violating his 4th amend. rights. The prosection side says wallet was obtained and evidence seized lawfully as to incident to arrest.

Petitioner submits his side of the story is correct and should be heard. Agent Anderson's affidavit was faulty, though in the last minute the prosecution corrected it before this court. Whether intentionally or mistakenly affidavit was undenibly incorrect on at least one material fact. The case UC agent Guerard could not remember the particulars of the arrest motion hearing trans. p.43 ln.6-18. Lastly, and most telling, the agent Anderson's perjured testimony at two grand juries and at the trial throws his credibility into question. Being the trial court had to decide the issue, an evidentary hearing is warranted.

29

Petitioner was arrested by DEA agents on March 15, 1999, at a probation office in the baesment of the Worcester Court House on Harvard St. During the service of the arrest warrant the keys to Petitioner's vehicle were seized. UC agent Guerard took the keys out to the street, searsh for and found the vehicle on a side street away from the courthouse. The agent had no reason or motive to look for and go to vehicle. The UC agent Guerad claims, "...I was going to drive it back to the Marshal's to secure it here...I wanted to find the car because I wanted it...I wanted to get it secure at the Marshal's so that if Mr. Henderson were released later on that day or a member of his family or wife or girlfriend wanted to retrieve the vehicle, it would have been safe and secure, not on that hill." This is his alleged motive prior to even knowing where the vehicle is located. Prosection AUSA Sinnot says, "Well, securing, impounding, by any other name, it's the same thing,..." This is an highly unlikely story. Agent Guerard is not a local police officer with "Community Caretaking Responsibilities." In Cady v. Dembrowski 413 U.S 433 (1973), The court desribed "the community caretaking functions" routinely undertaken by local police officers: Local police officers, **unlike federal officers**, frequently investigate vehicle accidents in which there is no claim of criminal liabilty and engage in what, for want aof a better term may be described as community caretaking functions, totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute.

Noninvestigatory search of automobiles pursuant to this

function, according to the court do not offend 4th amend.

principles so long as such activites are warranted, in terms

of state law or sound police procedure, "and are justified by

concern for the safety of the general public who might be en-

dangered if an intruder removed" a weapon which police reasonably

believed was present and located in a part of the vehicle vul-

nerable to vandals..." A wallet is a far cry from a weapon and

poses no safety risk.  Also the vehicle was legally parked on

a side street of the courthouse not in danger of being vandalized

There was no reason to seize, secure, impound or search the

car.

Petitioner was in the custody of the arresting agents and

by agent Geurard's own account, "He (Petitioner) complied with

Special Agent Anderson's request, Whatever that may have been.

He was vey cooperative." motion hearing trans. p.36 ln.5-6.

Petitioner posed no threat and was unable to reach the car to

manipulate, remove, or destroy anything in it including any

evidence.  In U.S v. Francolino 367 F.2d 1013,1017 Judge

Friendly stated, "We see no reason in principle why a car parked

immediately outside a house should stand better than a room

inside it which was not the place where defendeant was arrested.

Drummond v. U.S 350 F.2d 983,987.  Castaldi v. U.S 384 U.S 944

(1966).  The question rather is whether there was fair basis

for belief that the place searched--whether inside the house

or immediately outside it--would contain instruments or fruits

of the crime for which the arredst was made.  Harris v. U.S

supra, 331 U.S at 152-153.

In U.S v. Preston supra 376 U.S at 367, The court declared:

The rule allowing contemporaneous searches is justified, for

31

example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the desruction of evidence of the crime.  Things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control.  But these justifications are absent where a search is remote in time or place from the arrest  and in custody, then a search made at another place, without a warrant, is simply not an incident to the arrest...  Where Petitioner was under arrest at courthouse seizure of wallet from vehicle outside and streets away is not incident to arrest.

According to U.S v. Kelly 547 F.2d 82; The Constitution forbids only unreasonable searches and seizures, Elkins v. U.S 364 U.S 206,222 (1960).  It seems abundantly clear that there is a significant constitutionsl difference between stopping, seizing and searching a car on the open highway, and entering private property to seize and search an unoccupied parked vehicle not then being used for an illegal purpose.  Here the vehicle was locked and parked legally on the street.

The UC agent Guerard went out of courthouse in search of vehicle.  Once he found vehicle he used key to enter and then seized the wallet therin.  He returned to the courthouse and gave wallet to agent Anderson.  Anderson proceeded to search through wallet seize and copy all of wallets content.Heclaims to have recorded all the information on a form, motion hearing trans. p.23-24. This form was never produced to the defense in violation of the Brady rule of discovery.

In U.S v. Lugo 978F.2d 631, "...search of a truck and the resulting seizure of the firearm, cocaine was valid search

32

incident to his arrest.  Such a search is controlled by New
York v. Belton 453 U.S 454, ...It follows, therefore, that a
warrantless search incident to arrest is not valid if it is
"remote in time or place from the arrest," Chimel v. Cali.
395 U.S at 764 ... such that "no exigency exits." U.S v.
Chadwick 433 U.S 1,15; Thus, the rationale for a search incident
to arrest had evaporated.  Sabourin's inventory was not
contemporaneous because it was remote in time and in place as
regards Lugo and his truck being in entirely different locations
and no exigency existed.  As the court in Chadwick explained:
Once law enforcement officers have reduced...personal property
not immediately associated with the person of the arrestee to
their exclusive control, and there is no danger that the
arrestee might gain access to the property to seize a weapon
or destroy evidence a search of that property is no longer an
incident of the arrest.

Petitioner maintains that search of car and subsequent
seizure of wallet was unlawful.  Still, if the court finds the
search of car and seizure of wallet lawful, further search of
and seizure of walets content by agent was not.  In US v. Doe
61 F.3d 107, "Warrantless search at the police station-after
any exigency had ceased violated the 4th amendment...After
initial lawful search to find a container their must be probable
cause or warrant to open or go into container." Agents had
no probable cause to look into wallets contents. 61F.3d at 111
Although probable cause, as well as exigent circumstances, may
support the warrantless seizure of an enclosed opaque container,
see Texas v. Brown 460 U.S 730,743 (1983) (involving validity
of warrantless seizure of tied off balloon containing drugs),
the same probable cause showing

33

to justify its subsequent warrantless search. Id at 749-51...
Normally, therefore, once exigency ends, as by an arrest or
the seizure and custodial retention of a container by the police,
a neutral judicial officer must authorize any subsequent search
on a showing of probable cause.  U.S v. Soule, 908
F.2d 1032,1040."

According to the agents' testimony Petitioner's wallet
was seized at his arrest, motion hearing trans. p.23 ln.1-14;
"...We told him to empty his pockets. He took everything out
of his pockets and placed them on the table.  I took the wallet."
If the court finds this to be fact, which Petitioner denies,
it still does not give the agent the right to search and seize
and or copy contents of the wallet.  In U.S v Berenguer 562
F.2d 206 (1977) the appeallate was shackled to Sansone on a
bed and the billfold was clearly out of his reach or immediate
control.  See Chimel v. California, 365 U.S 752,763.  The content
of the wallet was not in plain view for agent to seize.  The
Plain view doctrine for warrantless searches and seizures is
subject to three express requirements (1)agents must be lawfully
on the premises; (2)the discovery must be inadvertent, and (3)its
incriminating nature must be immediately apparent.  Coolidge
v. New Hampshire, 403 U.S 443-69.  The agent may past muster
of the first requisite but fails on the other two.  Agent Anderson
prposely went through wallet looking for evidence; motion hearing
trans p. 27 ln. 11- p.28 ln.21. The last requirement was not
met at intial review of documents in wallet. In Berenguer the
the court having determined that money was illegally s.

34

seized it follows that it was error to permit the government agent to testify about finding it. We must therefore determine whether the error was prejudicial or harmless beyond reasonable doubt.  Chapman v. California 386 U.S 18 (1967).  The contents of the wallet were used at all stages of the trial for prosecution to develope its circumstantial evidence against petitioner.  The effect of the fruits of the warrantless search on the trial was highly prejudicial and without such evidence Petitioner would not have been convicted.

## Point IV

Pawn shop receipt

Petitioner's trial counsel objected to the admission of the pawnshop receipt foer a watch.  The government argues that the receipt shows Petitioner had $320 to retieve a watch as a direct result of getting $3,000 in alleged drug transaction. Trial trans. p.5-102-5-105.

All the pertainent case law says showing of substantial sums of money from unexplained sources is relevant and admissible "Possession of large amounts of unexplained cash in connection with the evidence of narcotics trafficking is generally relavant and admissible."  U.S v. Ariza-Ibarra 605 F.2d 1216,1225 "Evidence of large sums of unexplained cash is relevant to demonstrating an individual's involvement in illegal drug activities" U.S v. Figueroa 976 F.2d 1446,1454.

In the present case the amount of money spoke of is $320 for a pawned watch.  If document is understood to mean what prosecution says it means.  In any event $320 is a far cry from a showing of substantial or large sums of money.  The prosecution is reaching, this in no way, shape, or form shows the petitioner' status or financial condition.  In Williams v. U.S 168 U.S 382 (1897), the defendant was accused of taking two bribes of $85 and $100 from Chinese immigrants- a financial event of such small scale as not to suggest any connection with the bank deposits of the defendant and his wife of less than $5,000.

As in this case the payment of a pawned watch is of such a small scale as not to suggest the money had to have come from the alleged drug transaction.  No connection in the evidence

36

is made to corroborate the prosecution's conjecture. The admission of the pawnshop receipt was more prejudicial than probative and should never have been admitted into evidence for the jury to weigh.

Conclusion

Based on the foregoing, Petitioner prays and requests the Honorable Court to vacate the judgement of conviction in this cause and order that he be afforded a new trial.

Respectfully submitted,

*Chamond Henderson* 08/09/04

Chamond Henderson

#80165-038

Fort Dix West
P.O Box 7000-5802
Fort Dix, New Jersey
08640

### Certificate of Service

I, Chamond Henderson, certify that, on July 22, 2004, I caused three copies of the foregoing brief to be served by mail on the clerk of the district court.

United States District Court
Office of the Clerk
595 Main Street, Room 502
Worcester, Ma 01608

Respectfully Submitted,
Chamond Henderson
prose Petitioner

## Certificate of Service

I, Chamond Henderson, certify that, on July 22, 2004, Icaused one copy of the foregoing brief to be served by mail on the AUSA John A. Wortman, Jr.


John A. Wortman Jr.

Assistant United States Attorney

One Courthouse Way
Boston, Ma 02210
(617) 748-3207

Respectfully submitted,
Chamond Henderson
Pro se Petitioner

*Chamond Henderson*