1

I
1 - 23

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA,

     VS.                      Case No.

JOHN DOE.

---

Federal Grand Jury
U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts

Wednesday
February 17, 1999

APPEARANCE:   WILLIAM F. SINNOTT
                 Assistant U.S. Attorney

WITNESS:      TIMOTHY ANDERSON

**APEX Reporting**
(617) 426-3077

2

# I N D E X

WITNESS                                                    PAGE

Timothy Anderson

    Examination by Mr. Sinnott                        3

1                    P R O C E E D I N G S

2                                            (10:15 a.m.)

3                    TIMOTHY ANDERSON, Sworn

4           EXAMINATION BY MR. SINNOTT:

5      Q    Good morning, sir.

6      A    Good morning.

7      Q    Sir, in a loud, clear voice, could you state your

8  full name and spell your last name?

9      A    My name is Timothy Anderson, A-n-d-e-r-s-o-n.

10     Q    And, sir, you are a special agent with the Drug

11 Enforcement Administration?

12     A    Yes.

13     Q    And how long have you served in that capacity?

14     A    Approximately three years.

15     Q    And, sir, what is your current assignment with

16 DEA?

17     A    Currently, I'm assigned to the Boston, New England

18 Field Division.

19     Q    All right, sir.

20          And Special Agent Anderson, during the course of

21 your employment with the Drug Enforcement Administration,

22 have you had specialized training in narcotics enforcement?

23     A    Yes, I have.

24     Q    And have you also participated in a number of

25 investigations involving narcotics and controlled

1    substances?

2        A    Yes.

3        Q    Now, sir, directing your attention to October of

4    1998, were you involved in such an investigation in the City

5    of Worcester?

6        A    Yes, I was.

7        Q    And could you inform the Grand Jurors as to what

8    the target of that investigation was?

9        A    The investigation was a crack cocaine sales in

10   Worcester and the target of the investigation was a person

11   who we initially became familiar with as Butter, who we

12   later identified as Chamond Henderson, and two of his

13   coconspirators or workers identified as Robert Carey and

14   Kimberly Powers.

15       Q    And, sir, did Mr. Carey have a nickname that you

16   became familiar with?

17       A    Yes.  He was frequently calls Pops.

18       Q    All right.  Now, Special Agent Anderson, what

19   method did you use in order to penetrate this organization?

20       A    We used a confidential informant to initially get

21   into these targets.

22       Q    All right, sir.

23            And did this confidential informant have a

24   criminal history?

25       A    Yes, he did.

1    Q    And did that include drug offenses in that

2    informant's past?

3    A    Yes, it did.

4    Q    And, sir, did you take any electronic measures to

5    bolster your investigation with respect to this informant?

6    A    Yes.  Each time we used the confidential

7    informant, he was equipped with an electronic transmitting

8    device for the purpose of monitoring and recording any

9    conversations he had with these targets.

10    Q    And you're referring to the meetings that he had

11    with these targets?

12    A    Yes.

13    Q    All right, sir.

14        Now, Special Agent Anderson, let me direct your

15    attention to October 19th, 1998, and ask you to describe for

16    the Grand Jurors what transpired on that day?

17    A    On October 19th, this was the first transaction

18    that we did with these targets.

19        What we did was we met with the CI at a prelocated

20    -- predetermined location, he was searched for any

21    contraband, searched for any money.  Any money that he did

22    have on him, we temporarily held it.  He was given the

23    official funds to buy the crack cocaine.  He was equipped

24    with a monitoring device.  And then he was briefed as to

25    what he should do.

1    Q    And, sir, was this a procedure that you followed

2  in each of the subsequent transactions, as well?

3    A    Yes.  Each transaction that we did with the CI and

4  these targets, this is the procedure we used.

5    Q    All right, sir.

6         And what happened after you had taken these

7  measures on October 19th?

8    A    After this was done, we took the CI to a location

9  close to the target residence.  It was 6 Denny Street in

10  Worcester.  And the CS -- or the CI was observed walking to

11  the residence by agents.  He was observed going into the

12  residence and observed coming out of the residence after the

13  transaction was completed.

14    Q    All right.  And, sir, at some point, did you

15  debrief the CI as to what had taken place within the

16  residence?

17    A    Yes.  After the CI was -- after the CI did the

18  deal with the targets and he came out, I met the CS at a

19  predetermined location, picked him up and went back to the

20  location where we previously took him.  We searched him.  We

21  took the crack cocaine off of him and we debriefed him as to

22  what happened or what occurred in the residence.

23    Q    And was this also a procedure you followed after

24  each of the subsequent investigations?

25    A    Yes, it is.

1    Q    All right.  And what did the CI tell you had taken

2    place within 6 Denny Street on that date?

3    A    The CI stated that when he entered the residence

4    on the first floor of 6 Denny, Pops or Robert Carey was

5    observed on the telephone.  Apparently he was talking to

6    Butter at the time, the source of supply for the crack

7    cocaine.

8         As he was in the kitchen of the residence, he

9    spoke to Kim Powers and he showed her that he had the money

10   for the drugs, which was $1200 for the one ounce of crack

11   cocaine.

12        And after speaking -- after Carey spoke to Butter

13   on the telephone, he spoke again to the CI and then Butter

14   called back and told the CI that he would be there in

15   five minutes.

16   Q    Through Carey or directly to the CI?

17   A    Through Carey.

18   Q    All right.  And what happened next, according to

19   the CI?

20   A    Approximately five, ten minutes later, agents

21   observed a male black walking down the street from an

22   adjoining street, go into 6 Denny Street.

23        And from the debriefing of the CI, he told us that

24   what occurred was Butter came into the residence.  Butter,

25   the CI and Powers went to an adjoining bedroom where the CI

1    again counted the money and gave it to Butter, and in return

2    Butter handed the CI a newspaper, and inside the newspaper

3    was a plastic bag, containing the crack.

4            They discussed future deals and Butter told the CI

5    that, you know, anything else they want in the future, any

6    deals in the future would be through Butter -- through

7    Powers or Carey.

8        Q    All right, sir.

9            Now, at that point did the CI leave the premises?

10       A    Yes.  After the transaction was done, he left.  He

11   left the residence.

12       Q    And, sir, have you had occasion to listen to the

13   tape recording of that event?

14       A    Yes.

15       Q    How would you characterize it?

16       A    It's short, it was -- the recording was clear, but

17   without the debriefing, you'd -- you really would have to

18   listen to what's going on.

19       Q    All right.  And, sir, after the CI left 6 Denny

20   Street, you've testified that he met with you and other

21   agents; is that correct, sir?

22       A    Yes.

23       Q    And a substance was recovered from him at that

24   time?

25       A    Yes, it was.

1    Q    And was that substance subsequently sent to the

2    Northeast Regional Laboratory of DEA?

3    A    Yes, it was.

4    Q    And what was it determined to be?

5    A    It was determined to 23.7 grams of cocaine base.

6    Q    All right, sir.

7         Now, sir, let me direct your attention to

8    October 27th of 1998 and ask you to describe for the Grand

9    Jurors what took place on that date?

10    A    On that date, on October 27th, again, the CI made

11    arrangements through Kim Powers to purchase crack cocaine.

12    This time it was three ounces.

13         The CI met Powers at 6 Denny Street.  And at this

14    time Special Agent Guerard was introduced as a customer of

15    the CI.

16    Q    And that's Special Agent Rick Guerard?

17    A    Yes.

18    Q    And his last name is spelled G-u-e-r-a-r-d?

19    A    Yes.

20    Q    All right.  And so he was introduced as what?

21    A    As a customer of the CI's.

22    Q    All right.  And what happened at that time?

23    A    The CI, Powers and -- the CI and Powers got into

24    Special Agent Guerard's vehicle.  Special Agent Guerard

25    introduced himself to Powers and handed her $3,000 in funds

1   for the three ounces of crack cocaine.

2          Q      All right.  And what did Powers do at that time?

3          A      She counted the money and then she made sure it

4   was there, and then she instructed Special Agent Guerard to

5   drive to a different location down the street.  It was

6   approximately two blocks away, and told him to pull into a

7   parking lot, at which time he did.

8              He was observed or the CI and Powers were observed

9   getting out of the undercover vehicle, walking up the street

10  to 27 Wachuset Street and entering that building.

11         Q      All right.  Now, based on your later debriefing of

12  the CI, what happened after they got -- after Butter and the

13  CI got into 27 Wachuset Street?

14         A      Once the CI and Powers got into -- were observed

15  entering 27 Wachuset, in the debriefing, the CI stated that

16  they went down to the basement of the building.  It was a

17  large apartment building.  So they went down to the lowest

18  floor they could, and that's what they were instructed to

19  do.  And while they were down there, they met Butter,

20  Chamond Henderson.

21             While down there, the CI showed Butter that he had

22  the money, or Powers showed the CI (sic) that the money was

23  there.

24             The CI stated that Butter ran upstairs.  He thinks

25  -- he thought it was the second floor, he couldn't be sure,

1  and within a few seconds, came back downstairs, handed the

2  CW a package and Powers handed Butter the money.

3         At that time the CW and Powers exited 27 Wachuset

4  Street.

5     Q    Now, before they exited 27 Wachuset Street, did

6  Powers make a statement to the CI?

7     A    She thought -- she thought -- she told the CI that

8  she thought the Special Agent Guerard was a cop.

9     Q    All right.  Now, after the CI left 27 Wachuset

10 Street, what happened?

11    A    The CI -- Powers -- Powers left the area.  She

12 walked back toward her residence.

13        The CI got back in the vehicle with SA -- with

14 Special Agent Guerard.  Special Agent Guerard took the crack

15 cocaine and they drove back to the prearranged meeting spot

16 after the transaction was completed.

17    Q    All right, sir.

18        And was a substance recovered from the CI at that

19 time?

20    A    Yes.

21    Q    And what did that substance turn out to be?

22    A    Based on the analysis from the regional -- New

23 England Regional Lab, it was found to contain 73.2 grams of

24 cocaine base.

25    A    All right, sir.

1          Now, Special Agent Anderson, let me direct your

2    attention to November 3rd, 1998, and ask you to describe for

3    the Grand Jurors what happened on that date?

4      A    On November 23rd (sic), the CI again made

5    arrangements through Powers to purchase three ounces of

6    cocaine.

7      Q    I'm sorry, sir.  Is that November 3rd or

8    November 23rd?

9      A    November 3rd.

10     Q    All right.

11     A    The CI made arrangements to purchase another

12   three ounces of crack cocaine from Powers.

13     Q    Okay.  And what happened in pursuit of that

14   transaction?

15     A    The CI went to 6 Denny Street, again, and he met

16   with Powers.  She came out.  Again, got into Special Agent

17   Guerard's vehicle.  This time SA -- Special Agent Guerard

18   handed Powers the money.

19          She took it.

20          He asked her if she was going to count it?

21          She said, no.

22          So she instructed them, again, to drive to the

23   same location that they did the last deal at, which is

24   approximately two blocks away.

25          Powers and the CI were observed getting out of the

1   undercover vehicle, again, walking to 27 Wachuset Street and

2   going inside.

3       Q    All right.  And according to the CI, what happened

4   once they were inside?

5       A    Once they were inside, they again went to the same

6   basement area of the building.  While they were down there,

7   they were met by Butter.  This time, instead of running

8   upstairs, Butter had the package with him, except this time

9   the package was in a brown paper bag.

10          And at the time, the exchange -- the transaction

11  was made, and the CS -- or the CI and Powers exited the

12  building.

13      Q    Okay.  And what happened after they exited the

14  building?

15      A    The CI was picked up or met by Special Agent

16  Guerard and, again, taken to the prearranged location and

17  searched and took custody of the three ounces of crack

18  cocaine.

19      Q    Okay.  And was this, also, sent to a laboratory?

20      A    Yes, it was.

21      Q    And in this case, was it the state lab or the

22  Northeast Regional Laboratory?

23      A    It was the state lab.

24      Q    And what did the state lab determine this

25  substance to be?

1    A    81.09 grams of cocaine, free -- cocaine, free base

2 form.

3    Q    And based on your training and experience, is that

4 also known as crack cocaine?

5    A    Yes, it is.

6    Q    All right.  And, sir, did the CI, during his

7 debriefing, give any relevant information to the agents at

8 that time?

9    A    The CI stated that while he was -- he and Powers

10 were walking into or walking towards 27 Wachuset Street,

11 that she -- she thought Special Agent Guerard was a cop.

12 And she -- she also told the CI that if Special Agent

13 Guerard was a cop and she got arrested, she would have the

14 CI killed.

15    Q    All right.  Now, sir, let me direct your attention

16 to November 16th, 1998, and ask you what occurred on that

17 date?

18    A    On November 16th, again, arrangements were made by

19 the CI to purchase three ounces of crack cocaine.

20 Basically, the same scenario took place.  The CI was taken

21 to the area of 6 Denny Street and walked over, met with

22 Powers at 6 Denny Street.

23         A few seconds later, Powers and the CI came out of

24 6 Denny, got into the undercover vehicle.

25         This time Powers told Special Agent Guerard that

1    the meeting was in a different spot.

2              He drove up Denny Street, pulled over.

3              The CI and Powers are observed getting out of the

4    vehicle.

5              Powers told the CI that Butter was going to meet

6    him up on the street and that's where the deal was going to

7    be done, up around the corner, on the street.

8        Q    All right.  And what happened at that time?

9        A    From the debriefing, the CI stated that Powers and

10   the CI met with Butter.

11             He handed, the CI handed Butter the 3,000.

12             Butter handed him a newspaper containing a plastic

13   bag with crack cocaine.

14       Q    What was purported to be crack cocaine?

15       A    Yes.

16       Q    All right.  And, sir, after the CI met with the --

17   met with law enforcement officers, was that substance

18   examined?

19       A    Yes, it was.

20       Q    And could you describe the appearance of that

21   substance?

22       A    The appearance was a milky, white, rocklike

23   substance, but it didn't have the appearance to be crack

24   cocaine.  And when they opened the bag to field test it, you

25   could smell there was a sweet aroma coming from it, and it

1    -- from all indications, it was a -- it was wax.

2         Q    And, in fact, did the field test confirm the fact

3    that it was a nonnarcotic substance?

4         A    Yes, it did.

5         Q    All right.  And as a result of this, Special Agent

6    Anderson, what happened next?

7         A    A short time later at the -- at the agent's

8    directions, the CW or the CI was directed to go to -- try to

9    get ahold of Powers, again, at 6 Denny Street.

10        The CI went to 6 Denny Street, he was met by

11   Robert Carey and told that Powers was at Butter's residence.

12        The CI then exited 6 Denny Street, was again met

13   by agents, myself and Rick -- and Special Agent Guerard, and

14   debriefed about what happened on the inside and what he was

15   told.

16        Again, the CI was sent back into 6 Denny Street

17   approximately 15 minutes later.  And at this time he was

18   again met by Carey, who told him that Butter had telephoned

19   and told Carey to tell the CI that Butter would make good on

20   the deal.  That he would replace the three ounces of wax

21   with the real stuff.

22        Q    And, sir, this conversation and the earlier

23   conversation between Carey and the CI, were they monitored

24   by yourself?

25        A    Yes, they were.

1    Q    All right.  Now, sir, subsequent to that second

2  conversation between Carey and the CI, did Special Agent

3  Guerard have a conversation with Butter?

4    A    Yes, he did.

5    Q    Would you describe that?

6    A    While the CI was at the residence at 6 Denny,

7  instructed Carey to page Butter to the undercover agent's

8  cellular telephone number, which Carey did.

9         And then the CI left 6 Denny, went and got into

10  the undercover vehicle with Special Agent Guerard and,

11  again, paged Butter at the pager number.

12        Approximately five minutes later, Special Agent

13  Guerard received a telephone call and at that time he was

14  promised by Butter that he would make good on the deal and

15  that the following night, on November 17th, he would make

16  good on one ounce of crack cocaine, to make up for a partial

17  shipment, and the following night, he would deliver two and

18  a half ounces to make up for the remaining three ounces.

19    Q    So would it be fair to say that an extra half

20  ounce would be included in order to compensate for the sham?

21    A    Yes.  He told -- Butter told Special Agent Guerard

22  that the extra half ounce would be for the problems that he

23  caused.

24    Q    All right, sir.

25        Now, sir, at any time during this or subsequent

1  conversations, was a threat made by Henderson against

2  Special Agent Guerard?

3      A    There was.

4      Q    Could you describe that for Grand Jurors?

5      A    During the conversation, Butter told Agent Guerard

6  that if there was going to be problems, he would have his

7  boys come out and take care of the problem, whatever way

8  they could.

9          Meaning, you know, if there's going to be

10 violence, there's going to be violence.  He really didn't

11 care.

12     Q    All right.  Now, sir, let me direct your attention

13 to the following day, November 17th, 1998, and ask you what

14 happened on that date?

15     A    On that date, arrangements were made, again,

16 through Powers and Butter for the one ounce of crack cocaine

17 to make up for the sham product.

18         What occurred was the CI met -- the CI was at his

19 residence.  He was instructed to start walking down the

20 street, and at that time he was met by Powers, walking in

21 the opposite direction.

22         They stopped for a few seconds, the transaction

23 was made, and the CI was picked up by myself, taken to a

24 location where I took custody of the one ounce of crack

25 cocaine.

1    Q    All right, sir.

2         And was this submitted to the state lab, as well?

3    A    Yes it was.

4    Q    And what was it found to be?

5    A    19.68 grams of cocaine, free base form.

6    Q    All right, sir.

7         Now, after that transaction on November 17th, was

8    there any further contact between the CI or Special Agent

9    Guerard and Butter Henderson?

10   A    After that, the last transaction, no, he never

11   delivered the remaining two and a half ounces.  He refused

12   to deal with the CI or Special Agent Guerard in this

13   capacity.

14   Q    And how about Kimberly Powers, was she willing to

15   deal with the CI and/or Special Agent Guerard?

16   A    She was willing to deal with both, but they would

17   have to use a different source of supply.  They wouldn't be

18   able to go through Butter any more.

19   Q    All right, sir.

20        And, sir, is there anything of relevance to the

21   investigation that the Grand Jury should hear about?

22   A    Only that the CI has a history, but -- a criminal

23   history.  And based on his performance and the monitoring of

24   the recordings, that should be taken into consideration,

25   but ---

1       Q    Did you find the CI to be truthful and accurate

2   when you compared his debriefings to the tapes of the

3   transactions?

4       A    Yes.  He's been very truthful and forthcoming

5   about what's been going on and how they contact him and how

6   often they contact him.  He's been very truthful.

7       Q    All right.  Thank you, sir.

8           MR. SINNOTT:  At this time, are there any factual

9   questions for Special Agent Anderson?

10           GRAND JUROR:  Have you ever used this CI before in

11   any investigation?

12           THE WITNESS:  No, I hadn't, personally.  No.

13           GRAND JUROR:  Okay.  But overall, the tape

14   recordings were pretty clear, except maybe on one occasion?

15           THE WITNESS:  Yes.  Yes.

16           MR. SINNOTT:  Are there any other questions?

17           Okay.  With your permission, I'll excused this

18   witness?

19           GRAND JUROR:  Okay.  You're excused.

20           THE WITNESS:  Thank you.

21           (Whereupon, the witness left the Grand Jury

22   hearing room at 10:35 a.m.)

23           (Whereupon, the witness resumed the witness stand

24   at 10:44 a.m.)

25           MR. SINNOTT:  And for the record, the witness has

1    reentered the Grand Jury room.

2              And, sir, you're still under oath.

3        Q    BY MR. SINNOTT:  Sir, with respect to the

4    transactions that took place on October 19th, October 27th,

5    November 3rd and November 17th, are you familiar with the

6    area in which these transactions took place?

7        A    Yes.

8        Q    Is it fair to say that each of these four

9    transactions took place within a fairly small geographic

10   area?

11       A    Yes.

12       Q    And, sir, are you familiar with the presence of

13   any schools within that area?

14       A    There's an elementary school approximately, at the

15   most, two blocks from where all these transactions took

16   place.

17       Q    All right, sir.

18              Is that the Elm Street Community School?

19       A    Yes, it is.

20       Q    All right.  And is that located at the

21   intersection of North Ashland and West Streets?

22       A    Yes, it is.

23       Q    And, sir, is it your testimony that based on your

24   familiarity with the area and your subsequent investigation

25   of the location of that school, that each of these

1    transactions took place within a thousand feet of the Elm

2    Street Community School?

3        A    Yes.

4        Q    Thank you.

5            MR. SINNOTT:  Are there any questions of the

6    witness with respect to that?

7            Yes, please.

8            GRAND JUROR:  Were there any guns witnessed by the

9    CI or the agent?

10           THE WITNESS:  No.  These targets were not known to

11   have any -- carry any weapons, no.

12           MR. SINNOTT:  Are there any other questions?

13           Okay.  With your permission, I'll excuse the

14   witness.

15           GRAND JUROR:  You're excused.

16           (Whereupon, the witness was excused.)

17           (Whereupon, at 10:45 a.m., February 17th, 1999,

18   the above matter was concluded.)

23

## CERTIFICATE OF REPORTER

This is to certify that the attached proceeding

before:  __A FEDERAL GRAND JURY_____

in the Matter of:


UNITED STATES OF AMERICA

VS.

JOHN DOE




Place: Boston, Massachusetts

Date:  February 17, 1999


were held as herein appears, and that this is the original

transcript thereof.


*Marilyn J. Sandberg*

OFFICIAL REPORTER (Signature)
Marilyn Sandberg