1

I
1 - 21

UNITED STATES DEPARTMENT OF JUSTICE

OFFICE OF THE UNITED STATES ATTORNEY

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

     VS.                              Case No.

JOHN DOE.

Federal Grand Jury
U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts

Thursday
July 13, 2000

APPEARANCE:   WILLIAM F. SINNOTT
                 Assistant U.S. Attorney

WITNESS:     TIMOTHY ANDERSON

ORIGINAL

2

## I N D E X

<u>WITNESS</u>                                                      <u>PAGE</u>

Timothy Anderson

    Examination by Mr. Sinnott                                3

<u>EXHIBITS</u>   <u>DESCRIPTION</u>                                        <u>PAGE</u>

No. 1      Grand Jury transcript dated February 17,
           1999, witness Timothy Anderson                          15

TIMOTHY ANDERSON - 07/13/00                    3

1                      P R O C E E D I N G S

2                                              (1:31 p.m.)

3                      TIMOTHY ANDERSON, Sworn

4         EXAMINATION BY MR. SINNOTT:

5    Q    Good afternoon, sir.

6         Sir, in a loud, clear voice, could you state your

7    full name and spell your last name?

8    A    Timothy Anderson, A-n-d-e-r-s-o-n.

9    Q    And, sir, you are a special agent with the Drug

10   Enforcement Administration?

11   A    That's correct.

12   Q    And are you currently based in Boston,

13   Massachusetts?

14   A    Yes.

15   Q    And are you also -- do your duties also entail

16   enforcement actions in the Worcester, Massachusetts, area?

17   A    Yes.

18   Q    Now, sir, directing your attention to October of

19   1998, were you involved in an investigation in the City of

20   Worcester?

21   A    Yes.

22   Q    And who were the targets of that investigation?

23   A    Initially it was a subject by the name of, we knew

24   as Butter, who later became known as Chamond Henderson,

25   Robert Carey, Sr., and Kim Powers.

1      Q     All right, sir.  And, sir, as part of your

2   investigation, what enforcement techniques did you employ to

3   investigate Henderson and Carey and Powers?

4      A     Initially we used a confidential source.  Once the

5   confidential source made a buy, then we introduced an

6   undercover agent.

7      Q     Who was that undercover agent?

8      A     Special Agent Rick Guerard.

9      Q     And that's G-u-e-r-a-r-d?

10     A     That's correct.

11     Q     And did you equip the confidential source with any

12  electronic devices?

13     A     He was equipped with a transmitter, a --

14  transmitter so we can listen and monitor and record

15  conversations between the confidential source and any of the

16  targets.

17     Q     All right, sir.  Now let me direct your attention,

18  if I might, to October 19th, 1998, and ask you if an

19  operation took place on that particular date?

20     A     Yes, it did.

21     Q     Could you describe for the Grand Jurors what

22  happened on that date?

23     A     On that date, the confidential source made

24  arrangements through Powers and Carey to buy an ounce of

25  rock cocaine at 6 Denny Street.  We met with the

1  confidential source, we briefed him as to what we wanted to

2  do with him.

3         We searched him for any money, any contraband that

4  he may have had on him.  He was given $1200 government funds

5  to make the purchase of the crack cocaine.  And he was also

6  equipped with a moni -- the transmitter, the monitoring

7  device.

8         Once that was all done, the CS was sent to 6 Denny

9  Street, he went in and made contact with Kim Powers and

10 Robert Carey, Sr.  Carey was on the phone with the source at

11 the time, who was Butter.

12        When he went in, the CS, confidential source,

13 showed Kim Powers the money, the $1200.  At that time I

14 believe they went to the back bed -- or the bedroom in the

15 apartment.  About five minutes later, Carey received a

16 telephone call from the source, Butter, said he'd be over in

17 about five minutes.

18        Surveillance was established on the house.  I

19 observed a male, black, walk down Denny Street, enter in

20 6 Denny.  A few minutes later the CS came out, met with

21 Agent Guerard, and they went to a predetermined location.  I

22 stayed there and I observed the male, black, identified as

23 Butter, come out of the residence, walk down Denny Street to

24 Highland Street, and make a telephone call.  And then we

25 lost sight of him.

TIMOTHY ANDERSON - 07/13/00                     6

1      Q   All right, sir.  And, sir, the substance that

2   Butter, as you've described him, gave to the CS, was that at

3   any time analyzed?

4      A   Yes, it was.

5      Q   And what were the results of that analysis?

6      A   Came back from the Northeast Regional Lab as

7   23.7 grams of crack cocaine.

8      Q   All right, sir.  And, sir, let me direct your

9   attention to October 27th, 1998, and ask you if another

10  transaction took place as part of this investigation?

11     A   Yes, it did.

12     Q   And describe that for the Grand Jurors.

13     A   Okay.  Again, the CS was -- we met the CS, he was

14  searched again.  Every time we'd meet with him, he's

15  searched for contraband or money.  If he has money, we take

16  it from him and hold it temporarily.  He's equipped with a

17  monitoring device and he's given funds for purchase.

18         On this particular day, the CS met Powers at the

19  Denny Street, he had arranged to purchase 3 ounces of crack

20  cocaine.  The CS was observed going into 6 Denny Street by

21  myself and Special Agent Guerard.

22         At this time Agent Guerard was acting in an

23  undercover capacity, so he was sitting in the area of

24  6 Denny Street.  The CS went in, got Kim Powers, they walked

25  out to the undercover vehicle.  The UC got in the --

1    confidential source got in the rear seat, Kim Powers got

2    into the front seat.  Special Agent Guerard handed Powers

3    $3,000 of government funds for the purchase.  She counted it

4    and then instructed Agent Guerard to drive a couple of

5    blocks down on Highland Street to a parking lot of a Cafe

6    Bravo in Worcester.

7        Q     And what happened at that time?

8        A     At that time the undercover parked the vehicle,

9    Powers and the confidential source got out of the vehicle

10   and were observed walking down the street and entering

11   27 Wachusett Street in Worcester.

12       Q     Okay.  And what happened after the CS, along with

13   Powers, entered 27 Wachusett Street?

14       A     According to the confidential source, the

15   confidential source and Powers went down to the basement

16   area of that building, where they were met by Butter, who

17   was identified as the same person who delivered the first

18   package.

19             He came downstairs, Powers showed him the money,

20   and then he went upstairs.  The confidential source thought

21   it was maybe the second floor, he wasn't sure.  He was only

22   gone briefly.  Butter came back downstairs with a package,

23   it was a newspaper with a plastic bag that contained crack

24   cocaine, gave it to the CS.  The CS walked out of the

25   building, got -- walked to the undercover vehicle, got into

TIMOTHY ANDERSON - 07/13/00                    8

1   the vehicle, and the undercover the confidential source

2   left.

3       Q    And at some point did the CS give that substance

4   to DEA agents?

5       A    He initially gave it to Undercover Guerard.

6       Q    Okay.  And was that substance purchased on that

7   date subsequently analyzed?

8       A    Yes.

9       Q    And what were the results?

10      A    According to the Northeast Regional Lab, it

11  contained 73.2 grams of crack cocaine.

12      Q    All right, sir.  Now let me direct your attention

13  to November 3rd of 1998, and ask you if the investigation

14  continued on that date?

15      A    Yes, it did.

16      Q    What happened on that date, sir?

17      A    Basically, it happened the same as the previous

18  buy.  The CS was met, searched, given a transmitter, given,

19  I believe, $3,000 in government funds to make a purchase of

20  3 ounces of crack cocaine.

21           The CS went into 6 Denny Street, again, met with

22  Powers.  They came out, they got into the undercover

23  vehicle again with Special Agent Guerard.  Again, he was

24  instructed to drive to the Cafe Bravo parking lot, which

25  they did.

1          Once there, the CS and Powers were observed

2    again going into 27 Wachusett Street.  Again, according to

3    the confidential source, they went down to the basement

4    area.  This time they were met there by Butter.  He was

5    shown the money, he had the package on him this time, he

6    didn't run upstairs.  He gave the package to the

7    confidential source, he was given the money, and the CS

8    exited 27 Wachusett.

9          I believe this time Kim Powers stayed behind until

10   after the confidential source left.

11        Q    All right.  And after the confidential source

12   left, did he meet Special Agent Guerard again?

13        A    Yes, he did.

14        Q    And where did that take place?

15        A    He met right back at the Cafe Bravo, he got right

16   back into the vehicle.  Undercover Agent Guerard was waiting

17   in the parking lot in the vehicle.

18        Q    And was that substance that he purchased on that

19   date subsequently analyzed?

20        A    Yes.

21        Q    And what was it found to be?

22        A    It was found to contain 81.09 grams of crack

23   cocaine.

24        Q    All right, sir.  Now let me direct your attention

25   to November 16th of 1998, and ask if the investigation

1   continued on that date?

2        A    Yes.

3        Q    What happened on November 16th, 1998?

4        A    Again, the CS made arrangements with Powers and

5   Butter to purchase 3 ounces of crack cocaine.  The CS was

6   met by myself and Undercover Agent Guerard, he was searched,

7   equipped with a monitoring device and given $3,000 of

8   government funds to make the purchase.  He was briefed as to

9   what to do.

10            He was observed going -- walking into 6 Denny

11  Street.  He was observed coming out with Powers.  They were

12  -- Powers and the confidential source got in the undercover

13  vehicle.

14            At this time Powers told Special Agent Guerard

15  that the meeting spot was changed, this time the meet was

16  going to be on the street at the corner of Dicks and Denny

17  Street, that's where the meet was going to take place.

18            Powers told Agent Guerard to drive up the street

19  and pull over, which he did.  The CS, the confidential

20  source, and Powers got out of undercover vehicle, walked up

21  to the corner and just around the corner on Dicks and Denny,

22  and they were met there by Butter.

23            At this time Butter was given the $3,000

24  government funds, he handed the, I believe it was a paper

25  bag that contained a plastic bag, that contained what was

1    allegedly to be crack cocaine, to the confidential source.

2    Butter walked away, the UC or the confidential source again

3    walked down to the undercover vehicle, got in with Special

4    Agent Guerard and left the area.

5        Q    And shortly after leaving the area, did they have

6    occasion to examine the substance?

7        A    Yes.

8        Q    And what did they determine?

9        A    It was determined by Undercover Guerard,

10   Undercover Agent Guerard that the plastic bag contained a

11   milky, white colored rocklike substance, but it had a sweet

12   aroma to it, and it turned out to be wax.

13       Q    And did subsequent analysis confirm that estimate

14   that it was wax?

15       A    It did.

16       Q    Now, after Special Agent Guerard and the CS

17   analyzed this substance that evening, did they take some

18   further action?

19       A    Yes.

20       Q    What happened?

21       A    The CS was sent back into 6 Denny Street to make

22   -- try to make contact again with Kim Powers, but this time

23   she wasn't there, and Robert Carey spoke to the confidential

24   source, told him that Powers wasn't there, that Powers was

25   with Butter at Butter's residence, and that he had -- he

1   didn't know anything that was going on.

2       Q    Okay.  And what happened after that?

3       A    The CS left, he went back to the undercover

4   vehicle.  About fifteen minutes later he was sent back in,

5   he was told by Carey, I believe that Butter had called or

6   Carey had called Butter, and Butter had told Carey that he

7   was going to make good on the deal and that arrangements

8   were made by Carey to call the undercover phone that Agent

9   Guerard had.

10          The call was made and Butter told the undercover

11  that he would make the deal good by providing an ounce of

12  crack the next day.

13          And the following day, two days later, we were

14  provided another 2-1/2 ounces of crack to make the deal

15  good.

16      Q    Okay.  And having made these assurances, did they

17  have any further conversation that evening?

18      A    No.

19      Q    All right.  And directing your attention now to

20  the following day, November 17th, 1998, what happened on

21  that date?

22      A    The CS made arrangements with Henderson and Powers

23  to get the one ounce of crack cocaine.  The CS was told by

24  Butter to meet on Goulding Street, which is the next street

25  over from Denny Street, that's one street south off of

1    Highland.

2         The CS was walking down Goulding, Goulding Street,

3    he was met by Powers walking in the opposite direction. As

4    they passed, they stopped for a few seconds, Powers handed

5    the confidential source a package, and that package was

6    taken by -- he met, I believe it was Agent Guerard, who took

7    custody of the crack cocaine.

8         Q    All right.  And the substance that was purchased

9    or delivered on November 17th, 1998, was that analyzed?

10        A    Yes.

11        Q    And what was that found to be?

12        A    19.68 grams of crack cocaine.

13        Q    All right, sir.  Now, Special Agent Anderson,

14   after this investigation was over and the targets had been

15   arrested, did you have a conversation with the CS concerning

16   an allegation of drug use on his behalf during this

17   investigation?

18        A    Yes.

19        Q    And what did you find out from the CS?

20        A    The confidential source told me that between the

21   first and second buy, that he was at his residence, Powers

22   was there, and the confidential source's girlfriend,

23   Christine Byrne, were in the apartment, they all smoked

24   crack before, they're all friends or acquaintances.

25   Byrne, Christine Byrne and the CS had lived together for a

1  while.

2       On that particular occasion, he didn't know the

3  specific date, Byrne and Powers wanted to buy -- wanted to

4  smoke. So what they came up with is, since Powers owed

5  Butter a large amount of money, he wouldn't front her or

6  give her anything.

7            So what they decided to do was have the

8  confidential source call Butter or meet Butter at a

9  location. I believe it was -- the confidential source told

10 me it was on Dicks Street and Denny Street, up in that same

11 area, where Butter fronted the confidential source a $40

12 piece of rock cocaine.

13      Q    And what did he do with that rock cocaine?

14      A    He told me that they went -- he went back to the

15 apartment, and he, Byrne and Powers smoked the rock.

16      Q    All right.  Now, sir, let me direct your attention

17 to January 17th, 1999, and ask if you previously testified

18 before a Federal Grand Jury?

19      A    Yes.

20      Q    All right, sir.  And let me show you this

21 transcript and ask you if you recognize this transcript?

22      A    Yes.

23      Q    What do you recognize that to be, sir?

24      A    Testimony from the previous Grand Jury.

25      Q    And you've examined that transcript before have

1  you not?

2      A    Yes, I have.

3           MR. SINNOTT:  Mr. Foreman, at this time I'd move

4  to introduce this as an exhibit, it's a Grand Jury

5  transcript dated February 17th, 1999, witness Timothy

6  Anderson.

7           Thank you.

8                          (Grand Jury Exhibit No. 1 marked.)

9      Q    BY MR. SINNOTT:  Now, Special Agent Anderson, have

10  you had occasion during the course of this investigation and

11  subsequent to this investigation to observe the surrounding

12  area as to -- in relationship to where the deals were made

13  in this case?

14      A    Yes.

15      Q    And, sir, did it come to your attention during the

16  investigation and subsequently that there was a school in

17  the area?

18      A    Yes.

19      Q    Could you describe for the Grand Jurors what you

20  discovered?

21      A    There's an elementary school approximately --

22  well, actually, the furthest away from any of the deals,

23  from 27 Wachusett Avenue, it's four blocks.  The other deals

24  at Goulding Street and Denny Street are two and three

25  blocks, respectively, away from the elementary school.

1    Q    All right, sir.  And that elementary school, is

2    that the Elm Street Community School?

3    A    Yes, it is.

4    Q    So, sir, with respect to each of these

5    transactions that you've described, did each of them take

6    place within 1,000 feet of the Elm Street Community School?

7    A    Yes.

8    Q    All right, sir.

9    MR. SINNOTT:  And, sir, I have no further

10   questions at this time.

11   Do any of the Grand Jurors have any factual

12   questions for Special Agent Anderson?

13   Yes, sir.

14   GRAND JUROR:  Special Agent, when you --- when your

15   CS is doing a buy, you've got stiffed in that one where you

16   got the wax, isn't general practice to test it first

17   yourself, put it on your tongue or something, I don't know.

18   THE WITNESS:  No.  No, what we do is when he made

19   the purchase, he doesn't touch it, the confidential source

20   doesn't touch the drugs at all.  He'll make the purchase

21   and he'll bring it right back to the agents.  He's told,

22   don't, don't open it, don't do anything to it, just take it,

23   take custody of it and go directly to where you're told to

24   go.

25   When we have the briefing, when we first meet him,

1   we tell him, if this happens, this is what you do. All

2   right?  If everything goes well, what you'll do is you'll

3   make the buy, he'll leave, the target with leave, and you'll

4   come right back to where we tell you to go, which is right

5   to the undercover vehicle, in that case.

6          He took possession of the drugs, put it in his

7   pocket and walked right back to the undercover vehicle and

8   gave it to Agent Guerard.  Agent Guerard opened it.  As soon

9   as you open the plastic bag, you can smell it.  And if

10  you're around crack or coke long enough, it's got a

11  particular odor to it, because of the chemicals they use to

12  cook it and mix it, it has a particular odor.  This one had

13  a sweet aroma, and you could tell just by squeezing it and

14  smelling it that it's wax.

15         There's also a field test we do on it, we take a

16  very small piece, put it in a container and you break the

17  vials, and depending on the colors that change, it's a

18  presumptive test that it's crack cocaine, this had nothing.

19         GRAND JUROR:  So the target wouldn't get

20  suspicious in this case?

21         THE WITNESS:  No, he wouldn't know what was going

22  on, everything went as planned.

23         MR. SINNOTT:  Yes, sir.

24         GRAND JUROR:  What about the time that he did not

25  comply with your orders, the CS?

1        THE WITNESS:  When he what?

2        GRAND JUROR:  Went and smoked the crack.

3        THE WITNESS:  Well, we found out after, it was

4    after everybody was arrested.

5        GRAND JUROR:  What consequences does that -- would

6    that ---

7        THE WITNESS:  He could -- that depends on what the

8    Agency will do.  We can deactivate him.  He knows he wasn't

9    supposed to do it.

10        Q    BY MR. SINNOTT:  Let me ask you this, Special

11    Agent:  That occasion, was that in connection with one of

12    the transactions in this case or was that a separate ---

13        A    That was separate from what we were doing with

14    him.

15        Q    So he was not under surveillance at the time?

16        A    Right.  He was not under our control at the time,

17    he was -- he was living -- you know, he lives with his

18    girlfriend at the time, and Powers lived a block away, and

19    they all know each other.  And we weren't doing anything

20    between the first and second buys with him.  He knows

21    there's certain rules and regulations he has to follow when

22    he's not with us.

23        Q    And it's fair to state he did not have an

24    electronic ---

25        A    No.

1     Q   --- device on him at that time, either?

2     A   No. If he was out on the street and was caught

3  buying, buying the rock cocaine that he did get, he could

4  get locked up and there's nothing he could do about it. He

5  was not under our control at that time.

6          MR. SINNOTT:  Any other questions?

7          Yes, sir.

8          GRAND JUROR:  Agent, was surveillance undertaken

9  on all these drug transactions, on every single one of

10  them?

11          THE WITNESS:  Every time that we made a buy with

12  these targets, there was surveillance, either at Denny

13  Street or at Wachusett Street.

14          MR. SINNOTT:  Any other questions?

15          GRAND JUROR:  This transcript, I looked through

16  it, it's basically the same testimony he just gave just now,

17  isn't it?

18          MR. SINNOTT:  It's pretty close.

19          GRAND JUROR:  All right.

20          MR. SINNOTT:  Yes.  I think you'll find that, if

21  you go through it, he's added some additional things that

22  have come to light since that occasion.

23          Any other questions.

24          All right, with your permission, I'll excuse the

25  witness.

TIMOTHY ANDERSON - 07/13/00                    20

1          GRAND JUROR:  Sure.

2          MR. SINNOTT:  Thank you.

3          (Whereupon, the witness was excused.)

4          (Whereupon, at 1:55 p.m., July 13th, 2000, the

5    above matter was concluded.)

21

<u>CERTIFICATE OF REPORTER</u>

This is to certify that the attached proceeding

before: <u>A FEDERAL GRAND JURY</u>

in the Matter of:

    UNITED STATES OF AMERICA

    VS.

    JOHN DOE

    Place: Boston, Massachusetts

    Date:  June 13, 2000

were held as herein appears, and that this is the original

transcript thereof.

OFFICIAL REPORTER (Signature)
Carol Summers